The STATE of Ohio, Appellee,

v.

NORMAN, Appellant.

[Cite as *State v. Norman* (1999), 137 Ohio App.3d 184.]

Court of Appeals of Ohio,
First District, Hamilton County.

Nos. C–980874 and C–980872.

Decided Dec. 3, 1999.

*Michael K. Allen*, Hamilton County Prosecuting Attorney, and *Ronald W. Springman, Jr.*, Assistant Prosecuting Attorney, for appellee.

*Mary M. Sayler*, for appellant.

PAINTER, Judge, for the court on Assignments II through VIII.

We are presented with multiple issues stemming from this multiple-count indictment. Appellant, Leon C. Norman, Jr., was charged with robberies at five different stores, plus various associated counts. The jury parsed out the issues and found Norman guilty of most, but not all, of the charges. Norman finds great fault with his trial counsel, the conduct of the trial, and the sentences he received. We hold that the findings of guilt must stand, but we remand for resentencing.

## I. The Charges and Verdict

Norman was charged in an indictment containing five aggravated robbery counts, all first-degree felonies, and eight robbery counts, all second-degree felonies, with two firearm specifications attached to each count. The aggravated robbery charge in count one and the robbery charges in counts two and three all concerned a theft at the Highland Delicatessen. The aggravated robbery charge contained in count four and the robbery charges contained in counts five and six all concerned a theft at the White House Foods Delicatessen. The aggravated robbery and robbery charges contained in counts seven and eight, respectively, concerned a theft at the Parkview Market. The aggravated robbery and robbery charges contained in counts nine and ten, respectively, concerned a theft at the Westwood Delicatessen. The aggravated robbery charge in count eleven and the

robbery charges in counts twelve and thirteen concerned a theft at the One Stop Market.

A jury found Norman guilty of the Highland Delicatessen aggravated robbery charge and one of the affiliated robbery charges, the charges concerning the White House Foods Delicatessen and the Westwood Delicatessen, the aggravated robbery charge and one of the two robbery charges concerning the One Stop Market, and all the firearm specifications attached to those charges. It acquitted him of one of the robbery charges concerning the Highland Delicatessen, the aggravated robbery and robbery charges concerning the Parkview Market, one of the robbery charges concerning the Westwood Delicatessen, and all specifications attached to those charges.

As to the convictions concerning each of the establishments, the trial court sentenced Norman to one mandatory term of three years' incarceration on the attached specifications, to be served first, ten years' incarceration on each aggravated robbery conviction and eight years' incarceration on each robbery conviction. It ordered that the sentences for the underlying felonies relating to a specific establishment be served concurrently. It then ordered that the sentences relating to one establishment were to be consecutive to the sentences imposed for another, resulting in a twelve-year sentence for the specifications and a forty-year sentence for the underlying felony convictions—a total of fifty-two years.

Norman appeals his convictions, raising eight assignments of error. In his first assignment, he alleges that the trial court erred in sentencing him separately for aggravated robbery and robbery in connection with each incident, because aggravated robbery and robbery were in this case allied offenses of similar import. In his second, third, fifth, and seventh assignments, Norman claims that he was denied effective assistance of counsel because trial counsel failed to (1) move for relief from prejudicial joinder, (2) object to a witness not being sworn, (3) object to in-court identifications following an uncounseled pretrial lineup, and (4) object to witnesses' testimony that they had identified Norman at the uncounseled pretrial lineup. Norman contends, in his fourth and sixth assignments, that the trial court erred in admitting in-court identifications of him and testimony of witnesses that they had identified Norman from the uncounseled pretrial lineup. In his eighth assignment, Norman argues that the trial court erred in admitting testimony of witnesses identifying Norman, where the witnesses had discussed his identification during the pretrial lineup procedure.

### A. The Highland Delicatessen Robbery

According to John Foster, Jr., on May 8, 1998, at approximately 2:00 p.m., an African–American man, wearing a sweatshirt and dark pants, and approximately

six feet five inches tall, entered the Highland Delicatessen, a small grocery store located on Highland Avenue in Corryville, a Cincinnati neighborhood. Foster, the owner of the delicatessen, and Ruth Miller, a customer, were present. The man, later identified as Norman, asked Foster for a soft drink. When Foster provided the drink, Norman put a four-to-five-inch, dark-colored automatic gun in his face and told him to open the cash register or he would shoot him. While trying to open the register, Foster noticed another, lighter-complexioned African–American man standing near the door with a silver gun pointed at him. After telling the other gunman to hold his gun on Foster, Norman went around the counter and took approximately $100 to $300 from the register and asked Foster if he had a safe. Foster replied that he did not. After placing the cash and some cigars in a brown bag he took from the delicatessen, Norman told Foster to lie on the floor, and the two gunmen left. The incident lasted two to five minutes.

At a lineup, Foster identified Norman and Ronald Lawson as possibly being his assailants. He was unable to choose any suspect from a photographic array shown him. At trial, he testified that Norman looked familiar, but he was not "one hundred percent sure" that he was the man who had robbed him.

Miller believed that the robbery took place at 1:30 p.m. She stated that a man entered the delicatessen and asked Foster for a cigar, handing him a $10 bill. He then went outside and told another man standing outside to enter. She identified Norman as the man who was asked to enter the delicatessen. She testified that while Norman held a silver gun, the other man held a gun on Foster and demanded the money from the cash register and took a box of cigars. According to Miller, Norman told her, "It's all right, Ma'am." She described Norman as a black man and his cohort as a brown-skinned man. Miller definitely recognized Norman in a pretrial lineup and unhesitatingly identified him at trial.

### B.    The White House Foods Robbery

That same day, at approximately 2:30 p.m., Edward and Betty Schultz were in the White House Foods delicatessen, a small grocery store that they owned and operated in Clifton Heights, a Cincinnati, Ohio, neighborhood approximately eight blocks from Highland Avenue in Corryville. A man, later identified as Norman, brought a soft drink to the counter. He was wearing dark clothes and a jacket with a yellow or cream-colored print or logo on the back. While the man went back for a bag of potato chips, Mr. Schultz walked to the meat counter and Mrs. Schultz remained at the cash register. The man returned and handed Mrs. Schultz a $10 bill. When she turned to give him his change, the man had a dark square gun about eight inches in length pointed at Mr. Schultz's head. He instructed Mr. Schultz to get on the floor or he would "pop" him.

Mrs. Schultz started screaming and cursing at the man. He turned the gun on her and asked where the money and the safe were. When she told him that there was no money and no safe, he pushed her to the side and took approximately $60 from the cash register. He picked up the bag of potato chips from the counter and left. Mr. Schultz went outside and observed Norman cross the street and go down some stairs leading to Clemmer Street. Mrs. Schultz called the police. The incident lasted two to five minutes. The Schultzes later identified Norman in the pretrial lineup as the assailant. They also identified him at trial.

Todd Long, an engineering student, was unloading the trunk of his car on May 8. He saw a dark blue or black Ford Tempo containing three young, thin African–American men on Clemmer Street. The car entered the apartment complex on the street and the driver attempted to turn the car around. The right rear passenger side of the vehicle hit a fire hydrant, damaging the taillight. At that time, a man wearing dark clothing exited from the car and, without looking at the damage, walked up a set of stairs located next to the apartment complex. The White House Foods delicatessen sits 200 to 300 feet from the top of the stairs, which lead to a parallel street (McMillan). The other two men backed the car out, parked it, and got out to check the damage. Shortly afterwards, the other man ran down the stairs, holding what appeared to be a black sack or object in his right hand. He entered the car and it slowly drove away. Long was unable to provide a description of the men he saw and did not attend the pretrial lineup.

## C. The Parkview Market Robbery

On May 14, 1998, two African–American males committed a robbery at the Parkview Market, at 12:20 p.m. One of the men went behind the counter, pointed a small silver gun at Wallid Othman, the market's owner, and demanded cash from the cash register. He took the money. The other man took some boxes of cigars from the counter. Norman's palm print was found on the ice-cream display in front of the counter. Othman could not identify the robbers and did not attend the pretrial lineup. He testified at trial that he had never seen Norman before.

## D. The Westwood Delicatessen Robbery

On May 15, 1998, at 12:20 p.m., Falaah Alqaaydeh was working at the Westwood Delicatessen, a store owned by his cousin, when two African–American men entered. One of the men, later identified as Norman, went around the counter and held a small silver gun to Alqaaydeh's head and ordered him to open the cash register. Norman provided a plastic bag to the other man and handed him approximately $150 to $200 from the cash register and some cigarettes and

cigars. Alqaaydeh identified Norman as the gunman at the pretrial lineup. He also identified Norman at trial.

Ginger Mackey entered the Westwood Delicatessen right after the robbery. Before she entered the store, she noticed two people in front of the store. The first person, who had walked out of the store, wore a red shirt with a Nike "swoosh" logo and white shorts. She did not see his face. The second person, later identified as Ronald Lawson, almost knocked her over and carried a white plastic bag. She never saw a gun. Mackey did not attend the pretrial lineup.

### E.  The One Stop Market Robbery

On May 18, 1998, at 12:35 p.m., Linda Baira was working at a small grocery located on Reading Road, in the Cincinnati neighborhood known as Roselawn. Two African–American men entered. Her mother was also present in the store, as was Darnell Cook, a customer. According to Baira, one man came around the counter, placed a short gray and black gun to her head, and demanded that she open the cash register. He asked her if the store had a safe. It did, but the safe was empty. The gunman, later identified as Norman, took a bag of money from beside the safe. The other man put the money from the cash register into a plastic bag taken from the store. They also took boxes of cigars. She described the gunman as wearing black shorts, a tee shirt, a hat, and dark glasses. His cohort was wearing dark shorts, a dark tee shirt, and a hat. He did not have a gun. She identified Norman as the gunman at the pretrial lineup and at his trial.

Cook observed the robbery through the silver mirror located at the back of the store. He testified that Norman, the shorter of the two, wore a white shirt and that the other man wore a dark shirt. He testified that Norman's cohort had a nine-millimeter silver handgun. He testified that "they" said, "Give me the money or I'll shoot." Cook identified Norman at the pretrial lineup and at his trial.

### F.  Lawson's Testimony

Ronald Lawson, the man identified as Norman's accomplice in several of the robberies, testified that while he waited at the home of Jermaine Lowe, a man subsequently killed by the police, Norman and Lowe committed the robbery at the Highland Delicatessen. Norman showed him some money and a box of cigars on their return. The three men left and drove Lawson's black Ford Tempo to a side street near the White House Foods store. The street was not a through street, and when turning around to park, Lawson damaged the car's right taillight by hitting a fire hydrant. Before the car hit the fire hydrant, however, Norman got out and went up a flight of stairs. He returned with a white plastic bag containing some money. Lawson initially testified that he did not see a gun.

Upon prompting by the state, Lawson stated that he did see a gun after the robbery. Norman told Lawson that he had robbed an old man and woman. Lawson took Norman home to Northside, approximately three miles from Clifton Heights.

On May 15, 1998, Lawson and Norman went to the Westwood Delicatessen and robbed the clerk, based on Norman's suggestion. They parked the car down the hill from the store and walked up the hill together. Only Norman had a gun. While Norman pointed a gun at the clerk's head, Lawson put items in a white plastic bag. Lawson left the store first. They returned to Norman's house and divided the money.

Lawson testified that on May 14, 1998, between 2:00 and 2:30 p.m., he and Norman committed the robbery at the Parkview Market, at Norman's suggestion. After Lawson parked the Ford Tempo behind the store, the two men entered the store. Two white men were in the store at the time. Lawson stood by the front counter and held up a white plastic bag while Norman put money from the cash register and cigars in it. Lawson testified that Norman pointed a gun at the clerk during the robbery.

On May 18, 1998, the two committed the robbery at the One Stop Market. Initially, Lawson testified that the robbery was Norman's idea. Upon further questioning by the state, however, he said that it was his own idea. Lawson and Norman drove to the store, and Lawson parked the car on a side street. They both entered the store and saw two women behind the counter. Lawson walked to the back of the store and returned to the counter. While Norman held a big silver gun to the clerk's head, Lawson held the bag so that Norman could put money from the cash register and cigars into it. Lawson testified that the gun was the same gun involved in the other robberies. Lawson also stated that another African–American man was in the store on the floor. Lawson testified that neither he nor Norman wore sunglasses during the robbery. A few days later, the police stopped Lawson and arrested him. After questioning, he showed the police where Norman lived.

Lawson also testified about a robbery for which he, but not Norman, was charged. Lawson stated that, as in the other robberies, Norman held the gun in that robbery and that he held the bag.

## G. The Acquittals

The jury acquitted Norman of the robbery of Ruth Miller, the customer at the Highland Delicatessen. It also acquitted him of the aggravated robbery and robbery at the Parkview Market.

## II.   Consecutive Sentences

Although the issue has not been raised, we note a problem with the trial court's sentencing—the imposition of consecutive sentences.  At the sentencing hearing, the trial court stated:

"It goes without saying that all of these are terribly serious offenses.  The community was seriously interfered with in our private business and personal safety by the conduct of this defendant as well as others who were involved.

"Recognizing that the defendant has maintained his innocence, but, in fact, the evidence was significant [in] showing that he was involved and the jury was extremely discriminate in giving the defendant the benefit of those doubts that they felt were appropriate by finding him not guilty of at least four of those counts.

"So at this time, I'm simply going to say that these are offenses that carry serious penalties, and rightfully so, sir, because you just cannot interfere with other people's privacy and property.

"Recognizing that and recognizing that the information provided supports in every instance a requirement that there be severe penalties, we're going to proceed under Senate Bill Two sentencing provisions as follows[.]"

The court then proceeded to impose the maximum term of imprisonment on each count and to make the set of sentences for each establishment run consecutively.

The record contains a felony-sentencing worksheet.  The trial court, without indicating to which count it was referring, marked as a "more serious" factor under R.C. 2929.12(B) that the "[v]ictim suffered serious physical emotion/psychological harm."  It also indicated on the worksheet, again without reference to any particular count, that recidivism was likely based on the R.C. 2929.12(D) factors that Norman was under a type of court control, that he had prior delinquency adjudications or convictions, and that he had unsuccessfully been on probation or parole, and further noted as a relevant factor that the charged offenses involved a "series of serious crimes terrorizing small business owners."  Norman was on probation for a drug-abuse conviction.

R.C. 2929.14(E)(3) requires that the trial court find that the consecutive sentences are necessary to protect the public from future crime or to punish the offender, and that the consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public.  And the trial court must also find that the offender (1) committed the multiple offenses while awaiting sentencing or trial, under certain statutory sanctions, or under post-release control for a prior offense;  (2) caused such great

or unusual harm that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the conduct; or (3) has a history of criminal conduct that demonstrates consecutive sentences are necessary to protect the public from his future crimes. The trial court marked none of these factors on the felony-sentencing worksheet. Further, the trial court failed to mention whether any findings were made specifically in connection with the statutes applicable to the imposition of consecutive sentences.[1]

R.C. 2929.19(B)(2)(c) requires that the trial court make a finding giving its reasons for selecting the sentences imposed and provide its reasons for imposing the consecutive sentences. The record is insufficient under the guidelines established by *State v. Edmonson* to fulfill the statutory requirements for imposing consecutive sentences. Thus, we reverse the imposition of consecutive sentences in this case.

Upon remand, the trial court should keep in mind R.C. 2929.14(C) and 2929.19(B)(2)(e). R.C. 2929.14(C) requires that the trial court record a finding that Norman committed the worst forms of the offense or has the greatest likelihood of committing future crimes.[2] R.C. 2929.19(B)(2)(e) applies to a sentence for two or more offenses arising out of a single incident. Thus, if the trial court decides to impose the maximum prison term allowed for aggravated robbery when it merges the sentences as to each establishment, it must also "make a finding that gives its reasons for selecting the sentence imposed" and provide "its reasons for imposing the maximum prison term."[3] R.C. 2929.19(B).

### III. Ineffective Assistance of Counsel

We next address Norman's second, third, fifth, and seventh assignments, all of which claim ineffective assistance of counsel. To prevail on a claim of ineffective assistance of counsel, Norman "must demonstrate that his trial counsel substantially violated an essential duty owed to him and that this deficiency prejudiced his defense."[4] To demonstrate prejudice, Norman must show that "he was denied some substantive or procedural right that made the 'trial unreliable or the proceeding fundamentally unfair.'"[5] It is presumed that a

---

1. Accord *State v. Edmonson* (1999), 86 Ohio St.3d 324, 328, 715 N.E.2d, 131, 135.

2. See *State v. Edmonson*, 86 Ohio St.3d at 328, 715 N.E.2d at 135.

3. Accord *State v. Edmonson*, 86 Ohio St.3d at 328, 715 N.E.2d at 135.

4. *State v. Juarez* (July 17, 1998), Hamilton App. No. C–970368, unreported, 1998 WL 397375, at * 2, citing *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

5. *State v. Combs* (1994), 100 Ohio App.3d 90, 101, 652 N.E.2d 205, 211–212, quoting *Lockhart v. Fretwell* (1993), 506 U.S. 364, 370, 113 S.Ct. 838, 844, 122 L.Ed.2d 180, 190–191.

properly licensed attorney is competent. Further, this court will not find ineffective assistance based on debatable tactical decisions by trial counsel.

## A. Failure to Sever Counts

In his second assignment, Norman argues that he was denied effective assistance of counsel because trial counsel failed to move to sever the counts in the indictment for trial. Crim.R. 14 allows for separate trials on multiple counts in an indictment when joinder of the offenses would be prejudicial. Thus, to prevail on a motion to sever, Norman would have had to demonstrate that he was prejudiced by the charges being tried together.[6] A defendant is not prejudiced by joinder where the joined offenses are "simple and direct, so that a jury is capable of segregating the proof required for each offense,"[7] or when the evidence for each count would be admissible in the trial of the other counts under Evid.R. 404(B).[8] Evid.R 404(B) allows evidence of other acts or crimes as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

The evidence for each count would probably not have been admissible in the trial of the other counts under Evid.R. 404(B). But we believe the evidence as to each count was direct and uncomplicated and capable of being segregated. The evidence concerning each count was, in fact, sufficient to sustain each verdict.[9]

In each incident, the victims of the crimes described their assailant or assailants and identified Norman as one of the assailants. In contrast to the presentation of the state's evidence in *State v. Echols*,[10] in which we determined that it was not improbable that the jury confused the offenses and cumulated the evidence in a series of robberies tried together, the state in this case did not try the robberies in such a manner that the evidence of the various robberies was intertwined and testimony concerning each combined to such a degree that the offenses could not be separated. The evidence was presented in such a manner that it was separated and not improperly intertwined. The facts of each case were easy to understand, although each involved the robbery of a small neighbor-

---

6.  See *State v. Mills* (1992), 62 Ohio St.3d 357, 362, 582 N.E.2d 972, 979.

7.  *Id.*

8.  *State v. Wiles* (1991), 59 Ohio St.3d 71, 77, 571 N.E.2d 97, 108.

9.  See *State v. Brooks* (1989), 44 Ohio St.3d 185, 542 N.E.2d 636; *State v. Echols* (1998), 128 Ohio App.3d 677, 716 N.E.2d 728.

10.  *State v. Echols*, 128 Ohio App.3d 677, 716 N.E.2d 728.

hood grocery store during the afternoon hours. The jury was obviously capable of separating the evidence as it applied to each count and did not cumulate the evidence, as demonstrated by the counts upon which Norman was acquitted. Thus, failure to move to sever the counts did not constitute ineffective assistance of counsel.

### B. Failure to Object to the Failure to Administer Oath

In his third assignment, Norman claims that he was denied effective assistance of counsel because the trial court failed to swear in Mrs. Schultz. Evid.R. 603, R.C. 2317.30, and Section 7, Article I of the Ohio Constitution all require that a witness be administered an oath before testifying. While it is error for unsworn testimony to be admitted as evidence, such error is waived by failing to bring it to the court's attention.[11] This is because the failure to administer an oath can easily be corrected at the time; an attorney may not fail to object and then cite the lack of an oath as error. If that were possible, the remainder of the trial would be a "free play." In this case, Norman's attorney was able to effectively cross-examine Mrs. Schultz, whose testimony corroborated her husband's. We conclude that Norman has failed to demonstrate that counsel's failure to object to Mrs. Schultz's testimony was so egregious as to render his trial fundamentally unreliable. Therefore, we overrule Norman's third assignment.

### C. Failure to Object to Identification

Norman's claims of ineffective assistance of counsel contained in his fifth and seventh assignments are all premised on the allegedly invalid pretrial lineup conducted after his arrest without counsel present. Norman was arrested on May 21, 1998. The lineup occurred on May 29, 1998. He was indicted on June 8, 1998. Norman is not alleging that he was denied his right to counsel after requesting counsel following the presentation of *Miranda* warnings. Instead, he is asserting that his Sixth Amendment right to counsel was violated because the lineup took place without counsel present.

An accused's Sixth Amendment right to counsel attaches once adversarial judicial proceedings have been initiated against him, "whether by way of formal charge, preliminary hearing, indictment, information, or arraignment."[12]

---

11. *Stores Realty Co. v. Cleveland* (1975), 41 Ohio St.2d 41, 70 O.O.2d 123, 322 N.E.2d 629, syllabus; *State v. Palmer* (Aug. 29, 1996), Belmont App. No. 89–B–28, unreported, 1996 WL 495576; *State v. Prater* (Nov. 19, 1991), Franklin App. No. 91AP–448, unreported, 1991 WL 244961; *State v. Mason* (Sept. 20, 1983), Montgomery App. No. 8164, unreported, 1983 WL 4959.

12. *Kirby v. Illinois* (1972), 406 U.S. 682, 688–690, 92 S.Ct. 1877, 1881–1882, 32 L.Ed.2d 411, 416–418.

The arrest and detention of Norman did not constitute a formal charge.[13] Though there may very well have been charges filed prior to the indictment, nothing in the record demonstrates that there were prior charges—the record certified to us begins with the indictment. Thus, the record fails to reveal that the state had initiated any criminal proceedings against Norman at the time of the lineup. Accordingly, no Sixth Amendment violation is demonstrated in the record.[14] Because we cannot hold that Norman had a Sixth Amendment right to have counsel present, we cannot hold that trial counsel was ineffective for failing to object to Norman's in-court identifications on this basis. Thus, we overrule his fifth and seventh assignments.

## IV.  Trial Errors

### A.  Failure to Strike Identification Evidence

In his fourth and sixth assignments, Norman alleges that the trial court erred in not striking the in-court identifications made by witnesses and the witnesses' testimony that they had identified him at a pretrial lineup, because the lineup was conducted in violation of his Sixth Amendment right to counsel. As we have already explained, the record does not demonstrate that Norman's right to counsel had attached at the time of the lineup. Thus, we overrule his fourth and sixth assignments.

### B.  Failure to Strike One Stop Market Identification

In his eighth assignment, Norman contends that the trial court erred when it failed to strike testimony regarding his identification because two witnesses had discussed his identification during the pretrial lineup. Specifically, he seems to be arguing that the lineup procedure was so suggestive that the in-court identifications made by Cook and Baira were tainted. The defense made no objection to the identifications; thus, we must review this assignment for plain error. Plain error exists when, but for the error, the outcome of the trial clearly would have been otherwise.[15]

Norman was in the fourth position in the lineup, and Lawson was standing in the second position. Cook, the One Stop Market customer, identified

---

13. *State v. Stricklen* (1980), 63 Ohio St.2d 47, 17 O.O.3d 29, 406 N.E.2d 1110.

14. See *State v. Stricklen*; *State v. Sheardon* (1972), 31 Ohio St.2d 20, 60 O.O.2d 11, 285 N.E.2d 335; *State v. Wilson* (1978), 57 Ohio App.2d 11, 11 O.O.3d 8, 384 N.E.2d 1300; *State v. Echols*, 128 Ohio App.3d 677, 716 N.E.2d 728; *State v. Gamble* (Dec. 29, 1982), Hamilton App. No. C–820122, unreported, 1982 WL 9273.

15. *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804.

Norman from the lineup as one of the robbers. Cook stated that he was sitting next to Baira, the One Stop Market employee, during the lineup. He testified that during the lineup Baira spoke with someone else about Lawson. He did not identify Lawson from the lineup as one of the assailants. When asked on cross-examination whether he had talked to Baira during or after the lineup, he responded, "I didn't talk to her. I just told—We both agreed it was Number 4. But as far as Number 2, she was talking about that. I had nothing to do with it." He could not recall whether he had the opportunity to speak with Baira about the suspects before he notified anyone else about his identifications from the lineup. He said that he just happened to talk with Baira at the lineup and that he did not talk to anyone else.

Cook testified that the witnesses at the lineup were told to "ID the suspects, and then they said to discuss what do you think. Keep quiet, and he said what they told us is get a good look and after they left, they told us to discuss it among ourselves." (None of the other witnesses participating in the lineup testified that they had been given those instructions or indicated that they had talked to anyone during the procedure.) Cook testified that he picked Norman from the lineup before he spoke to anyone. He did not go to the police immediately after the viewing. He talked to Baira, and both agreed that the fourth person in the lineup (Norman) was one of the robbers. Cook testified that he identified Norman based on his memory of the robbery and not because of any discussion with Baira.

Baira testified that she attended a lineup where she identified the fourth man in the lineup as the gunman in the robbery of the One Stop Market. The lineup occurred with ten witnesses. She testified that the only person whom she talked to was a police officer, who explained the procedure. She denied having a discussion with any of the other witnesses. She identified Norman when she saw him in the lineup.

Police Specialist Dennis Ficker provided a general description of how a lineup is conducted. He testified that he was in the witness room when the lineup involving Norman was conducted. There were approximately ten witnesses and four police officers present during Norman's lineup. Normal procedures were followed, including admonishing the participants not to talk in the viewing area and to remain silent after the lineup was completed. Ficker testified that no one spoke during the lineup. He testified that he observed Baira and Cook and that neither spoke while viewing the lineup.

The witnesses then went into a lobby where each witness who indicated that he or she had recognized someone in the lineup was individually interviewed by a police officer. Ficker interviewed Cook and Baira. Baira indicated that she had

recognized the fourth man from the lineup as one of the robbers based on his face and build. Cook had recognized the fourth man based on his face and voice.

■■■■■ Identification testimony must be excluded when the pretrial identification procedures are so impermissibly suggestive that they create a substantial likelihood of irreparable misidentification.[16] An in-court identification is admissible, however, even where the identification procedure is improperly conducted, if the identification comes from "some independent recollection and observation of the accused by the witness" as established under the totality of the circumstances.[17] Accordingly, there is no due process violation in an identification that is "the result of observations at the time of the crime." [18]

■■■ This case demonstrates the problem with "cattle call" lineups where several witnesses are asked to view a lineup simultaneously. If we are to believe Cook, he spoke with Baira during the lineup, and they verified their identification of Norman in accordance with the instructions of the police officer in charge. This procedure obviously increased the risk that Norman was misidentified by Baira and Cook in the lineup. Thus, we must analyze the reliability of Norman's and Baira's in-court identification of Norman under the factors set forth in *Neil v. Biggers, supra.* These factors include the opportunity of the witness to view the offender at the time of the crime, the witness's degree of attention, the accuracy of the witness's prior description of the criminal, the level of certainty the witness demonstrates at the lineup, and the length of time between the robbery and the lineup.[19]

The lineup occurred approximately eleven days after the robbery. The robbery, which took place quickly, happened at approximately 12:35 p.m. Cook testified that he watched the robbery through a reflection in a mirror. He described Norman as the shorter of the two assailants. He heard one of the men say, "Give me the money. Hurry up. Give me the money or I'll shoot." He testified that he told the police that the man whom he later identified as Norman was an African–American and that he was wearing a white shirt. He could provide no description of height or weight. He testified that Norman was not the gunman. He testified that his identification of Norman was based on his observations of Norman during the robbery.

---

16. See *Simmons v. United States* (1968), 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247, 1253; see, also, *State v. Jells* (1990), 53 Ohio St.3d 22, 27, 559 N.E.2d 464, 469.

17. *State v. Jackson* (1971), 26 Ohio St.2d 74, 77, 55 O.O.2d 127, 129, 269 N.E.2d 118, 120; see *Neil v. Biggers* (1972), 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401.

18. *State v. Davis* (1996), 76 Ohio St.3d 107, 112, 666 N.E.2d 1099, 1105.

19. *Neil v. Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382, 34 L.Ed.2d at 411.

Baira, who testified in part with the aid of an interpreter, testified that Norman was the gunman and that he put a gun to her head and said, "Open the register, Bitch." She testified that Norman had on black shorts, a hat, a tee shirt, and dark glasses. One of the assailants was taller than the other. She testified that when she saw Norman in the lineup, she immediately recognized him. Under these circumstances, we believe that the identifications were sufficiently reliable to be admissible. Any discrepancy between the descriptions provided by the two witnesses would go to the weight of the testimony of the witnesses, not the admissibility of the identifications. Thus, because the admission of the in-court identifications was not erroneous, we overrule Norman's eighth assignment.

## V. Conclusion

Therefore, we affirm the trial court's judgment as to the findings of guilt entered upon the jury's verdicts. We vacate the imposition of consecutive sentences. This case is remanded for resentencing consistent with this decision.

*Judgment affirmed in part,*
*sentences vacated*
*and cause remanded.*

HILDEBRANDT, P.J., and GORMAN, J., concur.

GORMAN, J., for the court on Assignment I—the issue of allied offenses.

In his first assignment of error, Norman contends that the trial court should have merged the offenses of aggravated robbery and robbery for sentence as they are allied offenses of similar import. Under our former analysis employed in *State v. Fields* (1994), 97 Ohio App.3d 337, 646 N.E.2d 866, and *State v. Lang* (1995), 102 Ohio App.3d 243, 656 N.E.2d 1358, the offenses would be allied offenses of similar import. Both cases, however, employed the test promulgated in *Newark v. Vazirani* (1990) 48 Ohio St.3d 81, 549 N.E.2d 520, which the Supreme Court has expressly overruled in *State v. Rance* (1999), 85 Ohio St.3d 632, 710 N.E.2d 699, paragraph one of the syllabus. After *Rance,* the analysis in *Fields* and *Lang* is no longer the test for allied offenses of similar import.

Rather, a strict comparison-of-the-statutory-elements test is now used to determine if cumulative punishments for two offenses in one trial violate double jeopardy. This test consists solely of a textual analysis of the statutory provisions to determine whether the elements of the charged offenses " 'correspond to such a degree that the commission of one crime will result in the commission of the other.' " *Rance,* 85 Ohio St.3d at 638, 710 N.E.2d at 704, quoting *State v. Jones* (1997), 78 Ohio St.3d 12, 13, 676 N.E.2d 80, 81.

■ As the Supreme Court emphasized repeatedly in *Rance*, the comparison-of-the-statutory-elements test is performed *in the abstract*, with the focus solely on the statutory elements of the offenses, without reference to the facts of the particular case. If the elements of the offenses do not correspond to the necessary degree—that is, if each contains a separate element—"the offenses are of dissimilar import and the court's inquiry ends—the multiple convictions are permitted." *Rance*, 85 Ohio St.3d at 636, 710 N.E.2d at 703.

■ The linchpin of the *Rance* test is the observation that the General Assembly may prescribe cumulative punishments for specific offenses that would have constituted the same offenses under *Blockburger v. United States* (1932), 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306. The court concluded that R.C. 2941.25, the general codification of the test for allied offenses of similar import, " 'is a clear indication of the General Assembly's intent to permit cumulative sentencing for the commission of certain offenses.' " *Id.* at 635–636, 710 N.E.2d at 703, quoting *State v. Bickerstaff* (1984), 10 Ohio St.3d 62, 66, 10 OBR 352, 356, 461 N.E.2d 892, 896, fn. 1.

■ Here, as charged in the indictment, aggravated robbery requires proof that while committing a theft offense, the offender had a deadly weapon and brandished it. See R.C. 2911.01(A)(1). Robbery, as stated in the indictment, requires proof that while committing a theft offense, the offender threatened or attempted to inflict physical harm on another. See R.C. 2911.02(A)(2). After aligning the statutory elements of each offense in the abstract, we are convinced that each offense requires proof of an element that the other does not. Robbery requires proof of the threat of physical harm; aggravated robbery requires proof of brandishing a deadly weapon. An element of aggravated robbery, brandishing the weapon, is not required to prove the commission of robbery; conversely, a threat of physical harm is not required to prove aggravated robbery. We held exactly this in *State v. Hendley* (Aug. 4, 1999), Hamilton App. No. C–980687, unreported. As an intermediate appellate court, until the Ohio Supreme Court tells us otherwise, we must apply the clearly defined test for cumulative punishments in *Rance*, no matter if we disapprove of the result reached.

■ As to Norman's contention that brandishing a deadly weapon "encompasses" the threat to inflict physical harm, the Ohio Supreme Court could not have been more definite in its mandate to compare the elements "in the abstract," and not "in light of the particular facts in the case." *Rance*, 85 Ohio St.3d at 636, 638, 710 N.E.2d at 703, 704. In this respect, we have been admonished not to "usurp the legislative function by amending" R.C. 2911.01(A)(1) to read that one can commit aggravated robbery by threat to inflict physical harm. See *State v. Merriweather* (1980), 64 Ohio St.2d 57, 59, 18 O.O.3d 259, 260–261, 413 N.E.2d

790, 791. In *Fields*, this court observed that aggravated robbery and robbery would not be allied offenses of similar import "where the defendant was charged with aggravated robbery with a deadly weapon (R.C. 2911.01[A][1] ) and robbery with force (R.C. 2911.02)." *Fields*, 97 Ohio App.3d at 346, 646 N.E.2d at 872, fn. 6.

Therefore, with respect to the issue of allied offenses, strictly on the basis of *Rance*, the trial court's multiple sentences must be affirmed.

HILDEBRANDT, P.J., concurs.

PAINTER, J., dissenting on Assignment I—the issue of allied offenses.

Norman asserts that the trial court erred in sentencing him because robbery and aggravated robbery were, in this case, allied offenses of similar import. Norman failed to raise this issue at the time of sentencing. Even so, this court reviews his allied-offense claim under a plain-error analysis.[20] Under the plain-error analysis, we must determine "(1) whether there is an error, (2) whether it is plain error, and (3) whether the defendant was prejudiced."[21]

In determining whether offenses are allied offenses of similar import, a two-step analysis must be applied. First "the statutorily defined elements of offenses that are claimed to be of similar import are compared *in the abstract*."[22] (Emphasis *sic*.) As the Ohio Supreme Court has explained, "[c]ourts should assess, by aligning the elements of each crime in the abstract, whether the statutory elements of the crimes 'correspond to such a degree that the commission of one crime will result in the commission of the other.' "[23] If the offenses are allied offenses of similar import, the offender's conduct is then reviewed to determine whether the offenses were committed separately or with a separate animus. If the offenses were committed separately or there was a separate animus, an offender can be convicted of both offenses.[24]

It is obvious that aggravated robbery and robbery were in this case allied offenses. In each instance, the defendant committed one act of robbing a storeowner by threat of using a weapon. The use of the deadly weapon was what elevated the offense to aggravated robbery. Otherwise, it would have been

---

**20.** *State v. Fields* (1994), 97 Ohio App.3d 337, 344, 646 N.E.2d 866, 870.

**21.** *Id.*

**22.** *State v. Rance* (1999), 85 Ohio St.3d 632, 710 N.E.2d 699, paragraph one of the syllabus.

**23.** *Id.* at 638, 710 N.E.2d at 705, quoting *State v. Jones* (1997), 78 Ohio St.3d 12, 13, 676 N.E.2d 80, 81.

**24.** *State v. Blankenship* (1988), 38 Ohio St.3d 116, 526 N.E.2d 816.

"plain" robbery. It was one or the other, not two different things. Of course, the simple is not simple in the law, so courts have developed elaborate and often confusing tests to determine whether offenses are "allied." While this analysis only states the obvious, I have to discuss it.

Norman's aggravated robbery convictions in each instance required proof of (1) the commission of a theft offense and (2) having a deadly weapon on or about the offender's person or under his control, and displaying, brandishing, indicating he possessed, or using the deadly weapon.[25] His robbery convictions in each instance required proof of (1) the commission of a theft offense and (2) the infliction, attempt to inflict, or threat to inflict physical harm on another.[26] An examination of the elements of the two offenses in the abstract makes clear that the offense of robbery (theft with threat of physical harm) and the offense of aggravated robbery (theft while brandishing or displaying a deadly weapon) corresponded to such a degree that the commission of one resulted in the commission of the other. In other words, if a person brandishes a deadly weapon during a theft offense, the brandishment encompasses a threat to inflict physical harm—that is the very purpose of displaying a weapon. It is therefore impossible to commit the type of aggravated robbery alleged in this case without also committing robbery.

Because the robbery and aggravated robbery charges involved allied offenses, the next issue is whether Norman committed the crimes separately or with a separate animus. Norman was charged with and convicted of robbery and aggravated robbery of each establishment. To complete the theft element of each charge relating to each establishment, the state proved only one theft.[27] Obviously, Norman's sole animus was to take money from each establishment. Thus, the robbery and aggravated robbery of each establishment were done with the same animus.

Further, as to whether the robbery and aggravated robbery relating to each establishment were committed separately, it is apparent that the same conduct supported both charges: pointing a gun at the clerk and demanding money. Norman should not have been convicted for both robbery and aggravated robbery as to each establishment. Again, aggravated robbery includes robbery.

We have consistently held that it is prejudicial plain error for a trial court to impose separate sentences for allied offenses of similar import even when the

---

25. See R.C. 2911.01(A)(1).

26. See R.C. 2911.02(A)(2).

27. See *State v. Fields*, 97 Ohio App.3d at 346, 646 N.E.2d at 872.

sentences are to run concurrently.[28]  "The prejudice is a 'criminal record [that] will reveal convictions for two felonies' when the defendant has committed only one criminal act."[29]  Thus, we should sustain Norman's first assignment.  The multiple sentences imposed for the allied offenses of similar import should be vacated.

28.  See State v. Fields, 97 Ohio App.3d at 346, 646 N.E.2d at 872, and cases there cited; State v. Terry (Aug. 29, 1997), Hamilton App. No. C–960548, unreported, 1997 WL 602924.

29.  See State v. Fields, 97 Ohio App.3d at 348, 646 N.E.2d at 873, quoting State v. Burl (Dec. 16, 1992), Hamilton App. Nos. C–920167 and C–920194, unreported, 1992 WL 380020.