OPINION
{¶ 1} Defendant, James E. Fletcher, appeals from his conviction on two counts of armed robbery, with firearm specifications. After a jury trial, Fletcher was sentenced to three years on each firearm specification and nine years on each robbery conviction, with the latter sentences to be served concurrent with each other and consecutive to the firearm sentences. The result was a total sentence of fifteen years.
 {¶ 2} In support of his appeal, Fletcher raises the following assignments of error:
 {¶ 3} The jury verdict was against the manifest weight of the evidence.
 {¶ 4} The evidence presented by the State of Ohio in its case in chief was insufficient.
 {¶ 5} The Appellant was deprived of his right to effective assistance of counsel in contravention of the Fifth andFourteenth Amendments of the United States Constitution and Article One Section Ten of the Ohio State Constitution.
 {¶ 6} The trial court abused its discretion when it did not suppress the photographic identifications of the Defendant.
 {¶ 7} After considering the record and applicable law, we find the appeal without merit. Accordingly, the judgment of the trial court will be affirmed.
 I {¶ 8} We will consider the assignments of error out of order, because resolution of certain issues could impact other matters. For example, if the suppression motion should have been granted, that could moot arguments about manifest weight and the sufficiency of the evidence.
 {¶ 9} In the fourth assignment of error, Fletcher contends that the trial court abused its discretion by failing to suppress photographic identifications from two witnesses. Based on the totality of the circumstances, the trial court found nothing suggestive in the photographic identification procedure. Fletcher claims, however, that the procedure was unduly suggestive because the police did not show one witness all the photo arrays, and implied to the same witness that the array contained a guilty party.
 {¶ 10} Our review of suppression decisions is not based on an evaluation of credibility. Instead,
 {¶ 11} "`we decide if the trial court properly applied the law. * * * Therefore, we "accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting those facts as true, we must independently determine as a matter of law, without deference to the trial court's conclusion, whether they meet the applicable legal standard."'"State v. Cook, 149 Ohio App.3d 422, 2002-Ohio-4812, at ¶ 9
(citations omitted).
 {¶ 12} The reason for excluding tainted pretrial identifications is to protect defendants from the state's misconduct. State v. Brown (1988), 38 Ohio St.3d 305, 310. According to the Ohio Supreme Court,
 {¶ 13} "`"[w]hen a witness has been confronted with a suspect before trial, due process requires a court to suppress her identification of the suspect if the confrontation was unnecessarily suggestive of the suspect's guilt and the identification was unreliable under all the circumstances." * * * [The] factors to be considered [are]: "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation."'"State v. Gross, 97 Ohio St.3d 121, 126, 2002-Ohio-5524, at ¶19, quoting from State v. Broom (1988), 40 Ohio St.3d 277, 284.
 {¶ 14} Our review of the record indicates that the identification process did not unnecessarily suggest Fletcher's guilt. The charges against Fletcher arose from two robberies that occurred within a short time of each other. One robbery was of a CVS Pharmacy on September 7, 2002, and the other was of the Southgate Liquor Store on September 11, 2002. The cashiers on duty during these robberies were shown photo arrays of possible suspects, and both identified Fletcher as the person who had committed the robbery.
 {¶ 15} Patty Marshall, the Southgate cashier, was shown different photo arrays on three separate occasions. The reason for this was that the police had received three tips on possible suspects. Each array contained six pictures, including the suspect and five other men who had similar physical characteristics. When Marshall saw the first two photo arrays, she told the police that the robber was not among the persons shown in the photos. However, when Marshall was shown the third array on October 9, 2002, she picked Fletcher.
 {¶ 16} Later the same day, Detective Hicks showed the same photo array to Cathy Gregory, the CVS cashier. Gregory immediately picked Fletcher as the robber. Hicks testified that Gregory was shown only one array because the police had just one tip for the CVS robbery, as opposed to three for the Southgate robbery.
 {¶ 17} Both Hicks and Gregory testified at the suppression hearing. Fletcher contends that their testimony was contradictory and indicated suggestiveness. Specifically, Hicks testified that he showed Gregory the photo lineup and asked if any of the individuals shown was one who had robbed the store. In contrast, Gregory allegedly testified that Hicks asked her the following question: "which one of the guys in these pictures is the guy who robbed you?"
 {¶ 18} Contrary to Fletcher's claim, Gregory's testimony was not quite so unequivocal. Gregory did make the statement in question during her direct examination. However, on cross-examination, the following exchange occurred:
 {¶ 19} "Q. You stated that the detective showed you one set of lineup pictures —
 {¶ 20} "A. Uh-huh.
 {¶ 21} "Q. — Is that correct? And that when he showed you the lineup pictures, he asked you, `Which one of the pictures is the guy that robbed you.'
 {¶ 22} "A. Yes.
 {¶ 23} "Q. Is that how he said it? Which one of these pictures is the guy who robbed you?
 {¶ 24} "A. No. He asked me, you know, if I could look at these pictures and see if any one of them is the one that robbed me."
 {¶ 25} "Q. Okay. So what you said on your answers to the prosecutor was not accurate in terms of what the detective told you?
 {¶ 26} "A. What do you mean?
 {¶ 27} "Q. You stated that once he showed you the lineup, he told you, `Which one of these pictures is the guy that robbed you.'
 {¶ 28} "A. I told him which one it was.
 {¶ 29} "Q. Okay. But he didn't say that to you?
 {¶ 30} "A. I can't remember offhand what he said actually.
 {¶ 31} "Q. Okay. Did he tell you that the person that robbed you may or may not be in that lineup?
 {¶ 32} "A. No."
 {¶ 33} Gregory also testified during direct examination that Detective Hicks did not do anything to influence her selection of Fletcher as the robber. Consequently, the identification procedure was not unnecessarily suggestive. However, even if this were otherwise, "`* * * reliability is the linchpin in determining the admissibility of identification testimony * * *.'"State v. Moody (1978), 55 Ohio St.2d 64, 67, quoting fromManson v. Brathwaite (1977), 432 U.S. 98, 114, 97 S.Ct. 2243,2253, 53 L.Ed.2d 140, 154.
 {¶ 34} The robbery at CVS took place during daytime hours, and Gregory had an unobstructed view of the robber's face. At the time, the robber was standing only about four feet away. Gregory described him as having a "distinct look on his face, eyes, and nose," and displayed no lack of certainty about the identification. Accordingly, the identification evidence was reliable and the trial court did not err in overruling the motion to suppress.
 {¶ 35} Based on the preceding discussion, the fourth assignment of error is without merit and is overruled.
 II {¶ 36} In the third assignment of error, Fletcher contends that he was deprived of the effective assistance of trial counsel. This claim is based on counsel's failure to request severance; failure to put on a defense other than cross-examining state witnesses; and failure to address a notice of alibi that had been previously filed.
 {¶ 37} To establish ineffective assistance of counsel, a defendant must prove: (1) that counsel's performance was deficient; and (2) that prejudice occurred due to the deficiency.Strickland v. Washington (1984), 466 U.S. 668, 687,104 S.Ct. 2052, 2064, 80 L.Ed.2d 674. "Counsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation." State v. Bradley (1989), 42 Ohio St.3d 136,137, at paragraph two of the syllabus. Further, "[t]o show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Id. at paragraph three of the syllabus.
 {¶ 38} The first alleged deficiency is counsel's failure to move to sever the trials. Although the charges against Fletcher arose from robberies on two different days, both charges were joined in the same indictment. Fletcher contends that the failure to ask for severance was prejudicial because the testimony of the two cashiers was more powerful than the testimony of just one would have been. Moreover, eyewitness identification was the sole basis for conviction (other than Fletcher's failed lie detector test).
 {¶ 39} Under Crim. R. 8(A),
 {¶ 40} "[t]wo or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."
Joinder is favored where the offenses are "`of the same or similar character.'" State v. Lott (1990), 51 Ohio St.3d 160,163. Furthermore,
 {¶ 41} "[a] defendant is not prejudiced by joinder where the joined offenses are `simple and direct, so that a jury is capable of segregating the proof required for each offense,' * * * or when the evidence for each count would be admissible in the trial of the other counts under Evid. R. 404(B). * * * Evid. R. 404(B) allows evidence of other acts or crimes as `proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.'" State v. Norman (1999),137 Ohio App.3d 184, 197 (footnotes and citations omitted).
 {¶ 42} In the present case, both offenses occurred at similar times during the day, and at places of business in close proximity to each other. In each robbery, the robber took a small item up to the counter, as if he intended to pay for it. In the CVS robbery, it was a pack of gum; in the Southgate robbery, it was a bottle of pop. The robber also uttered similar phrases when accosting the cashier, and used a gun. However, even with these similarities, the "other acts" test may not have been satisfied. Compare Norman, 137 Ohio App.3d at 192-95 and 197(rejecting "other acts" finding, where defendants were alleged to have committed five similar robberies). To some extent, where this type of robbery is involved, most crimes will be similar, i.e, there is nothing particularly unique about a robbery in which the perpetrator simply pulls a gun and demands money from a cashier.
 {¶ 43} Nonetheless, even if the "other acts" test is not applicable, the facts of the CVS and Southgate robberies, like those in Norman, are "direct and uncomplicated and capable of being segregated." Id. at 197. The evidence on both counts was also not weak. See State v. v. Torres (1981), 66 Ohio St.2d 340,343-344 (noting that joinder may be prejudicial if offenses are unrelated and evidence on each is "very weak"). The fact that the primary evidence in the present case consisted of identification from eyewitnesses does not mean that the evidence was weak. There was simply no other evidence available.
 {¶ 44} We also do not agree that Fletcher's defense was prejudiced by the "bolstering" effect of eyewitness testimony about unrelated offenses. If this were the rule, the state could never join more than one offense in the same indictment. Notably, Fletcher has not pointed to any specific facts or prejudice that distinguish the present case from any other in which joinder of unrelated offenses has occurred.
 {¶ 45} As a further matter, we do not find counsel ineffective in regard to the notice of alibi or in failing to call witnesses. The notice of alibi simply indicates that Fletcher was "around his residence" during the dates and times of the alleged offenses. The notice does not list any specific witnesses. Thus, for all that appears on the face of the record, no one was available to furnish an alibi.
 {¶ 46} The record likewise fails to reveal details about any other possible witnesses who could have been called. Fletcher contends in his brief that his trial counsel could at least have called character witnesses, based on comments counsel made in the sentencing hearing. Specifically, trial counsel noted in the sentencing hearing that Fletcher was the father of several children, and was, as far as counsel could tell, a respectful and caring father. The choice not to call such witnesses appears, however, to have been a matter of trial tactics.
 {¶ 47} In this regard, we note that the record in the sentencing hearing indicates that Fletcher had previously served a two-year prison term for a robbery that took place in 1999. Trial counsel may have decided not to call witnesses in order to keep the jury from finding out that Fletcher had previously been convicted of a similar crime. This would have been a reasonable tactic. We "must be highly deferential to counsel's performance and will not second-guess trial strategy decisions." State v.Dixon, 101 Ohio St.3d 328, 2004-Ohio-1585, at ¶ 52.
 {¶ 48} Accordingly, the third assignment of error is without merit and is overruled.
 III {¶ 49} The first and second assignments of error are based on claims that the verdict was against the manifest weight of the evidence and that the State's evidence was insufficient to support the conviction. Before we address these points, we must note that Fletcher's brief refers to the wrong crime in addressing the sufficiency argument. Specifically, the brief refers to "aggravated burglary," and the elements of such under R.C. 2911.11(F), when the charged crime was actually aggravated robbery, under R.C. 2911.01(A)(1). This latter section states that:
 {¶ 50} "[n]o person, in attempting or committing a theft offense, as defined in section 2913.01 of the Revised Code, or in fleeing immediately after the attempt or offense, shall do any of the following:
 {¶ 51} "(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it * * *." R.C. 2911.01(A)(1).
 {¶ 52} The Ohio Supreme Court has said that:
 {¶ 53} "`"sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' * * * In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. * * * In addition, a conviction based on legally insufficient evidence constitutes a denial of due process." State v.Thompkins, 78 Ohio St.3d 380, 386-387, 1997-Ohio-52 (citations omitted).
 {¶ 54} In claiming that the evidence was legally insufficient, Fletcher focuses on the following matters: (1) inconsistencies between testimony at the suppression hearing and testimony at trial about why one victim was shown just one lineup; and (2) lack of physical evidence. However, after reviewing the trial transcript, we found no significant inconsistencies.
 {¶ 55} As we mentioned earlier, Hicks showed Patty Marshall (the Southgate cashier) three photo arrays, but showed Cathy Gregory (the CVS cashier) only one photo array. Marshall saw photo arrays on September 13, and on September 20, 2002. However, Fletcher was not pictured in either array, and Marshall told Hicks that the robber was not shown. Subsequently, on October 9, 2002, Hicks took a third array to Marshall. This array included Fletcher's picture, because he was the subject of an anonymous tip. Marshall identified Fletcher as the person who had robbed Southgate.
 {¶ 56} Later the same day, Hicks showed the photo array to Gregory, and she likewise identified Fletcher as the man who had robbed her. Hicks did not show Gregory the two prior lineups that he had shown to Marshall in September.
 {¶ 57} During direct examination at the suppression hearing, Detective Hicks testified that he showed Gregory a photo array on October 9, 2002. He also said he had spoken with Gregory on the phone before. Hicks did not say when this phone conversation took place, nor did he say whether he had spoken with Gregory more than once by phone.
 {¶ 58} Hicks did say during cross-examination at the suppression hearing that he spoke to Gregory (as well as Marshall) before he made up the first two lineups (which would have been in September, 2002). Both women told him that the suspect had a short "Afro" hairdo and had on a ball-cap. Hicks also said on cross-examination that he showed Gregory only one photo array because he had received only one tip for the CVS Pharmacy robbery, as opposed to the three tips he had for Southgate Liquor.
 {¶ 59} At trial, Hicks testified generally about the procedures he used in compiling the photo arrays and about the fact that both victims positively identified Fletcher from the array. Hicks did not go into detail about anonymous tips or phone conversations with the two cashiers. However, consistent with his testimony at the suppression hearing, Hicks said that he composed a lineup of each anonymous tip he had received.
 {¶ 60} In addition, Hicks stated on cross-examination: (1) that he showed Gregory the lineup with Fletcher on October 9, 2002, after he had showed it to Marshall; and (2) that he did not show Gregory the prior lineups. In this regard, Hicks stated that he had "a hard time getting hold" of Gregory. This remark is not inconsistent with testimony from the suppression hearing. Instead, it is entirely possible that Hicks spoke with Marshall by phone shortly after the robbery, and then had trouble thereafter contacting her. In any event, the record is devoid of any indication that Hicks was not being truthful.
 {¶ 61} We also are not troubled by the "lack" of physical evidence. Presumably, Fletcher is referring to the fact that the police could not successfully lift fingerprints from a pack of gum and a pop bottle that Fletcher allegedly handled. While fingerprint evidence could have been helpful, the officer who examined the fingerprints testified that the majority of tape lifts have no identification value and cannot even be used. Consequently, a lack of fingerprint evidence is not unusual.
 {¶ 62} In view of the type of criminal activity involved, physical evidence is often absent, and eyewitness identification will be the primary way of identifying a perpetrator. Notably, neither witness in this case hesitated when identifying Fletcher, and both women picked him out of the same group of pictures. Their testimony was adequate to establish all the essential elements of the crime, as both women testified that Fletcher committed a theft offense while brandishing or displaying a deadly weapon.
 {¶ 63} Because the evidence was legally sufficient to sustain the conviction, the second assignment of error is without merit and is overruled.
 IV {¶ 64} In the first assignment of error, Fletcher contends that his conviction was against the manifest weight of the evidence. In Thompkins, the Ohio Supreme Court explained that:
 {¶ 65} "`[w]eight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount ofcredible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief." * * *
 {¶ 66} "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `"thirteenth * * * juror"' and disagrees with the factfinder's resolution of the conflicting testimony. * * * ("The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.").'" 78 Ohio St.3d at 387 (emphasis in original) (citations omitted).
 {¶ 67} According to Fletcher, the verdict was against the manifest weight of the evidence because of the following problems: (1) the prosecution witnesses told "different stories;" (2) the fingerprint testimony was contradictory; and (3) there were discrepancies in estimates of eyewitness accounts of the robber's height.
 {¶ 68} In assessing this issue, we have reviewed the entire record, including the videotapes from the robberies. We find that the verdict is well-supported by the evidence. Contrary to Fletcher's claim, the eyewitnesses did not tell different stories. Both witnesses were positive and unequivocal in their identification of Fletcher, and they both had ample opportunity to see him close-up, in well-lit conditions, during daytime hours.
 {¶ 69} As proof of inconsistencies, Fletcher focuses on the fact that Marshall allegedly said that she only recognized Fletcher because of his "cold stare." Fletcher contrasts this with Gregory's alleged testimony that she "only" recognized Fletcher because of his nose.
 {¶ 70} In contrast, however, Marshall said during direct examination that she got a very good look at the robber, that she had time enough to look at his face, and that she was sure Fletcher was the robber. When asked if she focused on anything in particular, she said "just his eyes." She also commented that the robber's eyes "stood out."
 {¶ 71} On cross-examination, Marshall again reiterated that the she had a good opportunity to look at the robber's face. In this regard, the following exchange occurred:
 {¶ 72} "Q. Okay. And you mentioned that you could identify Mr. Fletcher from his eyes?
 {¶ 73} "A. Yes.
 {¶ 74} "Q. As — At least in part. Okay. What about his eyes, ma'am?
 {¶ 75} "A. He just had a very cold stare."
 {¶ 76} Likewise, Gregory was very sure about her identification. On cross examination, Gregory testified that the determining factor in picking Fletcher's photo was his nose. Gregory also said that maybe Fletcher's eyes had "really jumped out at her," but it was more his nose.
 {¶ 77} We do not find this testimony inconsistent. Regardless of a particular feature one individual may have focused on, the fact is that both witnesses had an excellent opportunity to view the defendant, in well-lit conditions, and they both independently identified Fletcher as the individual who had committed the robbery.
 {¶ 78} The fingerprint evidence was also not contradictory. Instead, the officer who testified (Parsons) simply made an error about how many fingerprints had been submitted from the scenes of the two crimes. However, after a question was raised during cross examination about the number of prints, Parsons went back to the lab and verified the correct number by using the latent archive drawer, where fingerprints are actually stored. Parsons then returned to court and corrected his testimony. Admittedly, the police could have been more careful in preparing for testimony. However, since none of the fingerprints was of any value, this error had no impact on the outcome of the case.
 {¶ 79} Finally, Fletcher challenges the eye-witness identification because of alleged discrepancies in heights listed for the robber. This point was not discussed in great detail during trial. However, apparently the report of one robbery listed the perpetrator as 5'9" in height, and the other report listed the robber as being 6' tall. Neither eyewitness was specifically asked at trial how tall she thought the robber was. These reports were also not submitted into evidence. Assuming for the sake of argument that a discrepancy existed in estimates of the robber's height, this was a matter for the jury to weigh.State v. Evans (1992), 63 Ohio St.3d 231, 248 (jury determines weight and credibility of eyewitness testimony). Presumably, the jury considered this point and found that it did not outweigh the positive identifications.
 {¶ 80} One bit of evidence the defense has not mentioned is the stipulated polygraph exam, which found Fletcher to be deceptive about his involvement in a robbery at the CVS Pharmacy. The Ohio Supreme Court has said that such stipulated results can have probative value in determining if a person being examined has been deceptive during interrogation. State v. Souel (1978),53 Ohio St.2d 123, 133-134. Again, the jury was free to decide what weight it would give to this evidence.
 {¶ 81} After applying the standards for setting aside the verdict on manifest weight grounds, we are unable to conclude that the jury lost its way and created a manifest miscarriage of justice. Accordingly, the first assignment of error is also without merit and is overruled.
 {¶ 82} In light of the preceding discussion, assignments of error one, two, three, and four are overruled, and the judgment of the trial court is affirmed.
Judgment affirmed.
Fain, P.J., and Grady, J., concur.