[Cite as *In re A.D.*, 2023-Ohio-276.]

# IN THE COURT OF APPEALS OF OHIO

SEVENTH APPELLATE DISTRICT
JEFFERSON COUNTY

IN THE MATTER OF:

A.D., K.D., X.D., M.Y.D.,

DEPENDENT CHILDREN.

---

**OPINION AND JUDGMENT ENTRY**
**Case Nos. 22 JE 0016; 22 JE 0017**

---

Civil Appeal from the
Court of Common Pleas, Juvenile Division, of Jefferson County, Ohio
Case Nos. 20 DN 44; 20 DN 45; 20 DN 46; 20 DN 47

**BEFORE:**
Cheryl L. Waite, Gene Donofrio, Carol Ann Robb, Judges

---

**JUDGMENT:**
Affirmed.

---

*Atty. Eric M. Reszke*, 100 North 4th Street, Suite 810, Sinclair Building, Steubenville, Ohio 43952, for Appellant Father

*Atty. Mary Adeline R. Lewis,* 712 North King Street, Xenia, Ohio 45385, for Appellant Mother

*Atty. Amanda J. Abrams*, 125 South 5th Street, Steubenville, Ohio 43952, for Appellee Jefferson County DJFS, Children Services Division

Dated: January 27, 2023

**WAITE, J.**

{¶1}     Appellants R.S. ("Mother") and M.D. ("Father") appeal four separate August 22, 2022 judgment entries of the Jefferson County Court of Common Pleas, Juvenile Division, granting permanent custody of their four children to Appellee Jefferson County Children Services ("Agency").  Appellants have filed separate appeals that have been consolidated for purposes of appeal.  Mother and Father both argue that the court erred in its balancing of the best interests factors, and generally take issue with the court's decision to grant permanent custody of the children to the Agency.  In addition, Mother argues that, for various reasons, her trial counsel provided ineffective assistance of counsel.  Father additionally argues that the court violated his right to due process when it failed to provide a remedy after it became known that his phone line had been disconnected for a significant period of time during the hearing.  For the reasons provided, Appellants' arguments are without merit and the judgment of the trial court is affirmed.

## Factual and Procedural History

{¶2}     Mother and Father have been in an on and off, tumultuous relationship for several years.  Their relationship has been plagued by drug and alcohol abuse and domestic violence.  This relationship produced four children who are involved in this appeal:  M.Y.D. (date of birth April 28, 2015), K.D. (date of birth March 14, 2018), A.D. (date of birth February 28, 2019), and X.D. (date of birth August 10, 2020).  We note that Mother has several other children who are not directly involved in this matter but are referenced throughout the proceedings.  It does not appear that Appellant M.D. is the father of those children.

**{¶3}** The Agency has had an ongoing file on the family since at least 2018. On March 14, 2018, the Agency received a report that K.D. (the second oldest child) tested positive for cocaine and Suboxone at birth. (Hrg. Tr., p. 86.) This caused the Agency to initially open a file, and a caseworker was assigned to the family. As a result, Mother began alcohol and drug treatment at Lighthouse Counseling and Mediation Services. The Agency began conducting monthly contacts with the family and referred the children to a program called "Help Me Grow."

**{¶4}** Additional concerns arose after the birth of A.D. (the third youngest child) on February 28, 2019. Mother tested positive for cocaine and THC throughout her pregnancy and the child was born prematurely. On March 14, 2019, A.D. was hospitalized due to a condition called "congenital adrenal hypoplasia." (Hrg. Tr., p. 89.) While the witnesses could not describe this condition, the symptoms leading to hospitalization included severe dehydration, grey skin coloring, and low weight. The attending physician informed Mother and Father that A.D. needed to be seen by an endocrinologist as soon as possible. Following two months of difficulty locating Mother and Father, a caseworker named Nicole Cook made contact with the parents and expressed concern over their failure to take the child to an endocrinologist. After additional significant efforts by the Agency, Mother and Father took the child to the Weirton Medical Center. Due to a high level of concern over the child's condition, the medical center transported the child to Pittsburgh Children's Hospital. On June 14, 2019, following A.D.'s discharge from the hospital, the Agency received an ex parte order from the court and removed the child from the home. The Agency received temporary custody

of A.D. and placed her with a foster family. The other children remained in the family home with Mother and Father and a case plan was devised for the family.

{¶5} Mother and Father complied with this case plan, and the Agency's temporary custody of A.D. terminated and she was reunited with her parents. Following reunification, Mother allowed the child to continue to visit the foster family with whom she had bonded during her stay.

{¶6} On August 22, 2020, X.D. (the youngest child) visited a pediatrician who determined that the child was failing to thrive. The physician provided the child with thickened formula. This visit triggered renewed communication from the Agency. Around that same time, Mother informed the Agency that Father had threatened to lock her out of the house. Mother also informed a caseworker that Father would leave the house during the winter and take the generator with him, leaving her and the children without heat.

{¶7} On December 3, 2020, Mother called law enforcement during an argument with Father that escalated and became physical. (Hrg. Tr., p. 95.) It is this event that led to the instant proceedings. All four children apparently witnessed the argument. M.D. (the oldest child) informed officers that "Daddy hit mommy and made her cry." (Hrg. Tr., p. 95.) Officers arrested Father for domestic violence. Mother's erratic behavior concerned the officers and led the police to remove the children. Apparently, Mother acted in a manner consistent with drug abuse. An Agency representative arrived at the house and spoke with Mother. The caseworker also believed Mother was acting erratically. The children appeared to be unclean and had matted hair. The caseworker was also concerned that the children had continued to play, for the most part, during this

incident and did not appear to react appropriately to the situation. The caseworker believed the children had normalized their parents' behavior. We note that Father was charged with domestic violence but later pleaded to the reduced offense of disorderly conduct.

{¶8} After this incident, the Agency placed A.D. with the foster family she previously had been with following her first removal. The remaining three children were placed with a foster family, but had to be moved after the foster mother gave birth to another child, placing the family over the limit for the number of children in their home. The children were then removed from a second home based on that family's request, due to the behavior of M.D. The children remained in their third foster home at the time of the hearing in this matter.

{¶9} After the children were removed, Mother and Father's relationship began to further unravel. Mother advised caseworkers that Father was abusive to her and that she was "petrified" of him. Specifically, Mother mentioned an incident where Father "put his hands on her neck and backhanded her in the face" and then "bit her index finger, which started bleeding." (Hrg. Tr., p. 39.) The caseworker observed a bandage on Mother's index finger. Caseworkers also observed bruises, marks, and scratches on Mother on several occasions that were believed to be caused by Father.

{¶10} Mother also described several other events that concerned caseworkers. First, she claimed that Father had thrown her out of the house and she was afraid of him, so she stayed in a tent in the woods. She claimed that he often took her phone away from her, leaving her with no way to call for help. The older children advised the caseworker that Father often hacks into Mother's phone. Mother also claimed that Father

would insert screws to lock the windows so that she could not enter the house when he was not home. One of the caseworkers provided Mother with information for a domestic violence shelter called "ALIVE." While Mother was inside the caseworker's office, Father called her and repeatedly asked her what she was doing. Mother also told caseworkers that Father was a drug dealer, and provided photographs of drug paraphernalia at the house.

{¶11} Mother and Father were permitted supervised visits with the children, but these were problematic. Father began approaching the foster parents in the parking lot and attempted to argue with them. The foster parents informed the Agency, which arranged for the foster family to enter the back of the building. However, Father learned about this and approached the foster parents there, as well.

{¶12} Mother and Father informed the Agency that they had ended their relationship and requested separate visits. Prior to this, the parents received two hours of joint visitation with the children. After their separation, each parent was scheduled to have one hour with the children; once one parent ended their visitation, the other would be brought in for visitation. At some point, the parents went back to joint sessions with the children even though the Agency had arranged for separate visitation times.

{¶13} The joint sessions led to several arguments between the parents in front of the children. Father apparently told the children that they could not come home because Mother "was a whore." The foster family related that Father told A.D. that Mother was "bad and had to go to a time-out." (Trial Tr., 47.) A.D.'s comments confirmed some of the Agency's observations. The children appeared distressed due to these visits. The Agency observed the children clinging to their foster parents, and K.D. often had to be

reassured by her foster family that they were coming back after the parental visits concluded. Nicole Cook testified that "[w]hat I have knowledge of is the constant discord between [Father] and [Mother] during visits, constant arguing, just everything in front of the children, really inappropriate conversation, cursing, being loud; you know, doing all of that in front of the children; which is obviously not appropriate, not healthy." (Hrg. Tr., pp. 115-116.) The parents only sporadically attended the visits and some were prolonged because of tardiness, causing problems for the two foster families.

{¶14} On January 28, 2021, the Agency prepared a case plan requiring Mother to seek alcohol and drug treatment, Father to obtain anger management therapy, and both parents to seek couples' counseling. All parties electronically signed the document. Father provided the Agency with a certificate for the completion of an online anger management class, however, the Agency informed him that an online class was insufficient. Father then claimed that he attended an in-person class, however the institution he provided informed the Agency that it had no record of his attendance. Mother and Father blamed each other for the failure to attend couples' counseling. Father claimed that he could not find Mother because she would not give her address due to her fear of him. Mother claimed that Father was unwilling to seek counseling. Father was incarcerated at the time of the hearing due to a second domestic violence charge involving Mother.

{¶15} Mother had made some attempts at alcohol and drug treatment at Lighthouse and had set up treatment with a counselor, Faith Montgomery, three times a week. However, she was unemployed and had recently been arrested for criminal trespassing. Mother and Father had separate residences. Mother was in Carroll County

and Father was in Jefferson County, but both were interested in moving out-of-state. Father wished to move to Tennessee where his family resides and Mother desired to move to Virginia with a friend as Mother had received a job offer at a truck stop.

{¶16} Father requested that the children be placed with his mother in Tennessee. The Agency contacted its counterpart in Tennessee and was informed that Father's mother did not have her own residence and was unable to take the children. The Agency determined that Mother's mother was also not available because she was caring for Mother's other children. The caseworker believed four of Mother's other children lived with their grandmother.

{¶17} M.Y.D. had issues at school stemming from the lack of attendance before being placed in foster care. M.Y.D. was in the process of receiving an Individualized Education Program ("IEP"). K.D. also had some concerns at school. She received speech therapy and was also in the process of obtaining an IEP. The youngest child, X.D., had difficulty learning to speak.

{¶18} K.D.'s foster family wishes to adopt her. The foster family of the other three children are strongly considering adoption but are waiting for the current proceedings to end before making a decision.

{¶19} On May 19, 2022, the Agency filed a motion seeking permanent custody of the four children. From the time of removal until the motion for permanent custody, the court reviewed the matter on a monthly basis and granted several extensions concerning the Agency's temporary custody. At least one of these extensions was granted to allow Father's mother to attempt to file for legal custody of the children. The initial GAL report and five supplemental reports detailed the children's progress in their foster homes and

Case Nos. 22 JE 0016; 22 JE 0017

provided observations regarding the wishes of the children. The GAL noted that the parents arrived late to most of their visitations, were ill prepared for those visits, and behaved inappropriately in front of the children. The GAL noted that the children were distressed before, during, and after visitation with their parents.

{¶20} On August 5, 2022, the court held a hearing on the matter. Mother and Father were separately represented by counsel. Also making an appearance was Rhonda Stubbs, a guardian ad litem from Court Appointed Special Advocates ("CASA"), along with Adam Martello, counsel for CASA. Relevant to this appeal, Mother and her counsel, Stubbs and Attorney Martello, and counsel for the Agency all appeared in person. During the hearing, several witnesses provided testimony, including: Kim Thrower (placement unit supervisor for the Agency), Nicole Cook (caseworker for the Agency), Mother, and Father. Although not sworn in nor subject to cross-examination, the foster parents were permitted to make statements at the conclusion of the hearing. Ms. Stubbs did not testify.

{¶21} Several issues arose during this hearing. First, counsel for the Agency raised a potential conflict of interest involving Adam Martello, counsel for CASA. Although not described within the record, it can be gleaned that CASA is a neutral party that serves a guardian ad litem role. Apparently Attorney Martello represented Father in an unrelated criminal case involving cruelty to animals. Father was ultimately convicted of this charge shortly before the children were removed in this case. Counsel for the Agency expressed her concern that, as she wished to use the conviction against Father in this matter, this evidence would be challenged on appeal given Attorney Martello's role in that case. Counsel for the Agency believed she would be unable to use the conviction against Father

if Attorney Martello remained involved in the case. The court, apparently misunderstanding the Agency counsel's concern stated that Attorney Martello could continue to represent CASA in the matter because the Agency offered to withhold the evidence. The court also accepted Attorney Martello's assertion that he had not discussed the case with the GAL before she completed her report and recommendation.

{¶22} Next, the court learned that Father, who attended the hearing by means of a jail telephone due to his incarceration, had been disconnected for at least an hour during the hearing. Neither the trial court nor trial counsel attempted to question Father as to what testimony he last heard before he was disconnected. The record does not reveal if curative measures were taken as a result, however, it appears there were none.

{¶23} On August 22, 2022, the court issued four judgment entries, a separate entry for each of the four children. Within the entries, the court determined that the children's interests were best served by granting permanent custody to the Agency. It is from these entries that Mother and Father separately appeal.

{¶24} After the notices of appeal were filed, several problems concerning transcripts arose which delayed this expedited appeal for almost three weeks. The Jefferson County Court Reporter requested an extension in which to file the transcripts from the trial court. On October 11, 2022, the trial court granted the court reporter's request and allowed him an additional fourteen days in which to file the transcripts. Despite the fact that a fourteen day extension was granted until October 24, 2022, the transcripts were not filed until October 27, 2022. This resulted in a delay of seventeen days.

{¶25} Such delays are troublesome in any case, but are particularly problematic in an expedited appeal. This particular appeal is also complicated by the fact that two notices of appeal were filed and multiple briefs were expected. We stress the importance of compliance at every stage of an expedited appeal with these deadlines, as they impact every subsequent step of the expedited process. By statute, this case required prompt action by everyone involved. Unfortunately, this matter has fallen short of those statutory mandates.

{¶26} On review, for ease of understanding the assignments of error will be addressed out of order and some of Mother's and Father's assignments of error will be combined, as they address similar issues.

<u>MOTHER'S ASSIGNMENT OF ERROR NO. 2</u>

THE TRIAL COURT ERRED IN GRANTING PERMANENT CUSTODY OF THE MINOR CHILDREN TO JEFFERSON COUNTY CHILDREN SERVICES AS MOTHER HAD SUBSTANTIALLY COMPLETED HER CASE PLAN AND THE AGENCY HAD FAILED TO ASSIST THE MOTHER IN RESOLVING THE ISSUES KEEPING THE CHILDREN FROM HER CUSTODY IN A REASONABLE AMOUNT OF TIME.

{¶27} Mother argues that the court erred in its decision because she substantially completed her case plan. Despite her claim that the Agency failed to provide basic resources to assist her in retaining custody of her children, she asserts that she has completed her original drug and alcohol assessment at Lighthouse and has begun some treatment. Although she concedes that she did not initially follow through with the

treatment process after her assessment, she explains that the conditions at Lighthouse were inadequate to facilitate any real effort towards sobriety. She alleges that when she arrived at the Lighthouse facility she observed individuals, including her cousin, "passed out" and others in an obvious state of impairment. Despite this, she later connected with a counselor at the facility and began her treatment process. She claims she supplemented her recovery at Lighthouse with additional treatment at a facility called "AppleGate Recovery," located in Pennsylvania. She also questions the evidentiary value of introducing her failed drug tests, claiming they lacked authenticity.

{¶28} The Agency responds by arguing that Mother showed little, if any, progress in fulfilling her obligations under the case plan. Mother's domestic violence claims against Father triggered the requirement for Mother and Father to attend couples' counseling. Neither Mother nor Father attempted to seek such counseling and domestic violence continued to be an issue up to the date of the hearing. The Agency's continued concerns with Mother's drug and alcohol issues had not been addressed from the time K.D. was born in 2018 until the issues leading to the second removal arose. Mother continued to test positive for drugs throughout the proceedings, including in a test taken shortly before the hearing.

{¶29} The record reveals Mother's drug problems were ongoing, as Mother continued to test positive for drugs more than three years after the Agency first became involved with the family. While Mother argues that she substantially complied with treatment, this assertion is contrary to the record. While Mother did receive an initial assessment at Lighthouse, she asserts that she was unable to follow up with treatment because the facility provided less than ideal conditions to allow for treatment. While

Mother's concerns are noted, it is hard to imagine a treatment center where the residents are all entirely sober. Mother may certainly find these circumstances at any treatment facility. At some point, Mother must learn to be responsible for her own sobriety. While she may have had some valid concerns, this record reflects that Mother has not made any real attempt to achieve sobriety. She appears to offer only excuses, and negatively respond to possible solutions.

{¶30} Mother was aware that the case plan required drug and alcohol treatment on at least January 28, 2021, when the parties signed the case plan. We note that the testimony suggests Mother had been required to undergo such treatment well before this date as a result of prior dealings with the Agency.

{¶31} Nicole Cook referred to communications she had with Lucas Bennett, employed by Lighthouse. Bennett informed her that Mother had completed an assessment in March of 2022 and he planned to send Mother a closure letter after she failed to attend treatment. Cook had not received any positive updates from that correspondence. Another Lighthouse employee sent Nicole Cook a letter advising that Mother was scheduled to begin treatment on June 21, 2022 and a second appointment was scheduled for July 19, 2022. While it appears Mother attended both of these sessions, she failed to appear for a July 25, 2022 session without notice. This appointment was rescheduled for July 27, 2022. Mother again failed to attend the session.

{¶32} At the hearing, Nicole Cook provided the following drug test results for Mother: May 25, 2022, positive for cocaine, ecstasy, amphetamines, and methamphetamines; June 21, 2022, positive for THC; June 28, 2022, positive for THC;

July 6, 2022, positive for THC; and July 27, 2022 positive for THC. (Hrg. Tr., pp. 103-104.) In addition, Cook testified that Mother had admitted to drug use during the time the case was pending, particularly marijuana.

**{¶33}** While Mother now complains that these correspondences and test results were not authenticated, no objection was made at trial. Mother previously had signed releases regarding all of this information. In fact, Mother seemed to agree in her testimony that she had not been able to meaningfully seek sobriety. She conceded that she tested positive for THC the day before the hearing. (Hrg. Tr., p. 143.) She volunteered that she had the test results in her car and would provide them if needed. When her trial counsel asked her if four months would be sufficient to allow her to comply with the terms of the plan, she responded in the affirmative.

**{¶34}** Again, Mother has been subject to her drug and alcohol treatment requirement since at least January 28, 2021. While there was discussion of an assessment scheduled for March of 2020, it does not appear the assessment was completed until May 21, 2022. Regardless, Mother did not begin treatment until late June of 2022, a year and a half after signing the case plan. When the Agency expressed concern that treatment had been delayed for such a significant period of time Mother's counselor, Faith Montgomery, advised Nicole Cook that Mother's attendance had been "[s]poradic" and inconsistent. (Hrg. Tr., p. 104.) As Mother never called to cancel sessions, no reason for her failure to appear was ever given.

**{¶35}** This record provides no support for Mother's claim that four additional months would assist her in obtaining treatment. As pointed out by the Agency, the trial court granted four extensions of time before considering the motion for permanent

custody, each time finding that "the case plan is not completed and that the parents are not completing case plan goals." These extensions were granted on April 19, 2021; February 22, 2022; March 21, 2022; and April 25, 2022. Again, the hearing for permanent custody occurred on August 5, 2022, giving Mother several additional months to attempt to comply with her case plan.

**{¶36}** Mother has not shown there was any particular obstacle to completing the case plan other than her personal failure, as she acknowledged in her testimony. (Hrg. Tr., p. 151.) Thus, there is no evidence that granting another four months, or any other reasonable extension would allow Mother to abide by the terms of the case plan. Again, she has been familiar with this plan since at least January 28, 2021. This is particularly true as her treatment counselor described her attendance as "very sporadic." (Hrg. Tr., p. 104.) Appellant's limited attendance at the treatment center cannot, in good faith, be described as substantial compliance.

**{¶37}** We note that the Agency weighed Mother's lack of compliance with couples' counseling against her. The record clearly demonstrates that Father's domestic violence was the reason for the couples' counseling requirement. While it is true that both Mother and Father were required to complete this counseling, the Agency knew that Mother feared Father, and two caseworkers had knowledge of not only specific accusations involving Father's abuse, but also observed marks on Mother's body consistent with those claims. In addition to Father's domestic violence arrest that led to these proceedings, Father was jailed at the time of the hearing due to a second domestic violence incident involving Mother.

**{¶38}** In a vacuum, Mother's concerns for her safety should not be held against her. Any decision to hold her responsible for being reluctant to provide Father with her contact information given her legitimate fears presents a slippery slope for domestic violence victims. That said, this record presents evidence that, despite Mother's concerns, she continued to participate in joint visitation with Father even though the Agency arranged for them to have separate visitation to avoid forcing her to be in the same room as Father.

**{¶39}** Because Mother did not substantially comply with either the drug and alcohol treatment or couples' counseling, her second assignment of error is without merit and is overruled.

## MOTHER'S ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ERRED IN FINDING THAT IT IS IN THE MINOR CHILDREN'S BEST INTEREST THAT THEY BE PLACED IN PERMANENT CUSTODY OF THE JEFFERSON COUNTY CHILDREN SERVICES AS THE PROSECUTION FAILED TO MEET ITS BURDEN OF PROOF AND THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

## FATHER'S ASSIGNMENT OF ERROR NO. 1

THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING THE AGENCY'S MOTION FOR PERMANENT CUSTODY.

**{¶40}** Both Appellants attack the court's decision that the best interests of the children were served by placing them in the permanent custody of the Agency. Mother

questions whether the court considered all of the R.C. 2151.414(D)(1) factors, specifically, whether secure placement of the children could be made without the award of permanent custody, and the wishes of the children. Mother argues that one of the caseworkers admitted that the Agency may not have given her proper guidance on how to satisfy the case objectives. Mother complains of the Agency's failure to provide names, phone numbers, and locations of facilities that could assist her. Mother also asserts that the court relied on several findings within the GAL report, but claims this was error as the GAL did not testify at the hearing.

{¶41} Father's arguments essentially challenge the witnesses' testimony. He disputes the claim that he failed to seek anger management treatment. He challenges the testimony provided by the caseworkers and claims he has attended sessions at Christian Counseling Association and that he signed all requisite releases before the hearing, and there should be evidence to support his claims. As to the couples' counseling, Father explains that he could not locate Mother and could not complete this counseling without her. He also disputes the allegation that he is abusive and asserts the charge stemming from the incident leading to the incident at issue was reduced to disorderly conduct. He denies allegations that he confronted or in any other manner engaged with the children's foster families at visitation. He also contradicts testimony from the caseworkers and statements contained in the GAL reports: he claims that visitation with the children went well, he and Mother did not argue, he was attentive, and he played with the children and brought food and drinks for them. Finally, he argues that the Agency did not seriously consider other family members for the children's placement.

**{¶42}** A parent's right to raise a child has long been established as an essential and basic civil right. *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997). For this reason, Ohio courts have viewed the permanent termination of parental rights as the family law equivalent of the death penalty in a criminal law case. *In re Hoffman*, 97 Ohio St.3d 92, 2002-Ohio-5368, 776 N.E.2d 485, ¶ 14. However, statutory laws exist to permit an agency to intervene for the purpose of protecting children. *Matter of J.C.*, 7th Dist. Monroe No. 20 MO 0012, 2021-Ohio-1476, ¶ 2, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816.

**{¶43}** Where a child custody proceeding involves a parent and a nonparent, a court may not award custody to the nonparent "without first determining that a preponderance of the evidence shows that the parent abandoned the child; that the parent contractually relinquished custody of the child; that the parent has become totally incapable of supporting or caring for the child; or that an award of custody to the parent would be detrimental to the child." *Id.,* at ¶ 3. "A preponderance of the evidence is evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it. In other words, evidence that, as a whole, shows that the fact sought to be proved is more probable than not, or evidence that is more credible and convincing to the mind." *Id.,* citing *JAD Rentals of Youngstown, LLC v. Cox*, 7th Dist. Mahoning No. 19 MA 0096, 2021-Ohio-304, ¶ 20.

**{¶44}** Where the child custody proceedings involve a parent and nonparent, a two-part test is followed. First, an agency seeking permanent custody of a child bears the burden of proving that one or more of the conditions in R.C. 2151.414(B)(1)(a) through (e) applies. In its entirety, R.C. 2151.414(B) reads:

[T]he court may grant permanent custody of a child to [the agency] if the court determines at the hearing * * * by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child * * * cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

(b) The child is abandoned.

(c) The child is orphaned, and there are no relatives of the child who are able to take permanent custody.

(d) The child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period and * * * the child was previously in the temporary custody of an equivalent agency in another state.

(e) The child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any court in this state or another state.

Case Nos. 22 JE 0016; 22 JE 0017

For the purposes of division (B)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code [to be an abused, neglected, or dependent child] or the date that is sixty days after the removal of the child from home.

**{¶45}** Here, the trial court found that the children could not be safely placed with either parent within a reasonable period of time and that the children had been in the custody of the Agency for more than twelve months since December 3, 2020. Neither Mother nor Father appear to contest the first prong. Instead, Mother and Father focus their arguments on the court's evaluation of the best interest factors and its adherence to the requirement that the parents must be afforded all procedural and substantive protections.

**{¶46}** Proceeding to the second prong, the Agency holds the burden of proving by clear and convincing evidence that the grant of permanent custody is in the child's best interest. *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 26. In determining whether this burden has been met, courts are guided by R.C. 2151.414(D)(1) which provides a nonexhaustive list of factors for consideration. R.C. 2151.414(D)(1) reads, in pertinent part:

In determining the best interest of a child * * *, the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

{¶47} The Ohio Supreme Court has declared that a parent facing permanent termination of a parental right "must be afforded every procedural and substantive protection the law allows." (Citation omitted.) *Hayes* at 49, 679 N.E.2d 680. We review a trial court's judgment in child custody matters under an abuse of discretion standard. *In re N.W.F.*, 2019-Ohio-3956, 147 N.E.3d 86 (7th Dist.), ¶ 15, citing, *Davis v. Flickinger*, 77 Ohio St.3d 415, 418-419, 674 N.E.2d 1159 (1997).

{¶48} Mother argues that the court failed to consider the wishes of the children. The GAL reports all contained findings that the children were too young to express their wishes in this matter. In fact, the GAL noted that the eldest child expressed a desire to live with her parents and "the mermaids." In addition, there is a plethora of testimony that

the children clung to their foster families when arriving at visitation, had to be assured they would return to their respective foster families following visitation, and were distressed after visitation. As the court integrated this information into its findings, it clearly considered this factor.

{¶49} Mother and Father both contend the children could be placed without granting permanent custody to the Agency. Their arguments attack the court's findings that they failed to comply with any aspect of the case plan. However, this record reflects that neither Mother nor Father made any real attempt to comply with the case plan. There was ample testimony that Mother and Father constantly argued in front of the children at visitation, and Nicole Cook testified that the children were distressed by their visits. She testified that the children clung to their foster families, had to be reassured that they would return to their foster families, and were distressed after visitation. Cook believed that Mother and Father were more concerned with airing their grievances towards one another than they were with visiting the children. While Father did provide food at visits, he typically brought soda and junk food for these young children. On one occasion, neither Mother nor Father had diapers and had to borrow one from another family who happened to be conducting visitation that day.

{¶50} Father also complains that more efforts should have been directed at finding other family members who could take the children. However, the Agency quickly ruled out Mother's mother, as she already had custody of Mother's other four children. Father informed the Agency that his mother, who lives in Tennessee, could take the children, but the Agency learned she did not have her own residence and had never met the children. We note that the Agency went to great effort to locate Father's mother and contacted its

counterpart in Tennessee to evaluate her situation before determining that she was not a suitable option. The Agency also expressed concern for her failure to follow directions and that she waited until the eleventh hour to become involved. There is no evidence that Mother or Father provided the name of any other relative to the Agency. Father now claims that he has other family in Tennessee, but no one has come forward expressing an interest in the children and there is no evidence that Father provided the Agency with the appropriate contact information for these individuals. It is unreasonable to expect the Agency to conduct an investigation into suitable relatives who were not disclosed by Mother or Father.

{¶51} Regarding Father's arguments, he merely disagrees with witness testimony, which creates an issue of credibility. Clearly the trial court believed the Agency's witnesses and there is nothing in this record to suggest the court was unreasonable.

{¶52} Mother claims that the Agency failed to provide resources that could help her meet her case plan objectives. However, a lack of resources does not appear to have been the obstacle preventing Mother from meeting her objectives. This record establishes that Mother was referred to Lighthouse for drug and alcohol assessment and treatment, but failed to take advantage of this referral. The Agency also referred Mother to a shelter that assists domestic violence victims. It does not appear that Mother ever contacted the shelter. Mother argues generalizations, and does not cite to any specific failure on the part of the Agency.

{¶53} Based on the above, Mother's and Father's first assignments of error are without merit and are overruled.

Case Nos. 22 JE 0016; 22 JE 0017

MOTHER'S ASSIGNMENT OF ERROR NO. 3

THE MOTHER'S SIXTH AMENDMENT RIGHT TO EFFECTIVE COUNSEL WAS VIOLATED WHEN COUNSEL FAILED TO MAKE REAOSNABLE [SIC] REPRESENTATION WITH ANY TACTICAL CONSIDERATION.

{¶54} Mother lists an extensive list of alleged deficiencies in her trial counsel's representation which she believes amount to ineffective assistance. Mother notes that the list is not exhaustive, however, we are limited to the issues she actually raises within her brief, as this Court does not independently review the record in search of unraised errors.

{¶55} In response, the Agency points out that Mother did not object to any of these alleged errors at the hearing, thus is limited to a plain error analysis.

An appellant's failure to object at trial waives all but plain error." *Fearer v. Humility of Mary Health Partners*, 7th Dist. No. 06 MA 84, 2008-Ohio-1181, 2008 WL 697761, ¶ 119. Plain error is present when "there is an obvious deviation from a legal rule that affected the defendant's substantial rights by influencing the outcome of the proceedings." *In re T.J.W.*, 7th Dist. No. 13 JE 12, 13 JE 13, 13 JE 14, 2014-Ohio-4419, 2014 WL 4959150, ¶ 11. Plain error review is not favored in civil cases and should only be used in the "extremely rare case involving exceptional circumstance where error, to which no objection was made at the trial court, seriously affects the basic fairness, integrity, or public reputation of the judicial process, thereby challenging the legitimacy of the underlying judicial process itself." *Kirin v.*

*Kirin*, 7th Dist. No. 08 MA 243, 2011-Ohio-663, 2011 WL 497080, ¶ 19, quoting *Goldfuss v. Davidson*, 79 Ohio St.3d 116, 679 N.E.2d 1099 (1997), at paragraph one of the syllabus.

*In the Matter of S.B.J. v. Connolly*, 7th Dist. Mahoning No. 20 MA 0010, 2021-Ohio-1161, ¶ 27, quoting *Andes v. Winland*, 7th Dist. Belmont Nos. 15 BE 0060 and 15 BE 0080, 2017-Ohio-766, ¶ 45.

**{¶56}** Beginning with Mother's arguments regarding the admission of three exhibits admitted into evidence, she is subject to a plain error review as she failed to object in the trial court. Exhibit A is a Tennessee "ICPC" letter in which that agency disclosed Father's mother did not have her own home and requested to close the case. It is difficult to determine Mother's exact argument, here. Regardless, Father testified to essentially the exact information contained within the exhibit. Thus, Mother cannot show introduction of this letter constituted a deficiency on the part of counsel, nor can she show prejudice.

**{¶57}** Exhibit B is a certified copy of Father's disorderly conduct conviction. Mother questions the relevance of this document. It appears that Mother is confused, believing the exhibit is a certified copy of her own conviction. However, this document is a certified copy of *Father's* disorderly conduct conviction. Because this document does not involve Mother, it is difficult to discern how it affected her rights.

**{¶58}** Even so, trial counsel did object to admission of this exhibit at the hearing, questioning its relevance. The trial court overruled the objection, as Father's arrest and subsequent conviction is what triggered the removal process in this matter. The conviction is the result of Father's arrest after Mother called the police to report domestic

violence, which led to the children being removed from the home. There is little question that this exhibit is relevant. As to its authenticity, the trial court correctly pointed out that a certified copy of a conviction is a self-authenticating document pursuant to Evid.R. 803(22).

**{¶59}** Mother also takes issue with exhibit E, which is a report from her Lighthouse counselor, Faith Montgomery. Mother does not take issue to the report itself, but to the fact that a caseworker was permitted to testify about the contents of the report in lieu of Montgomery providing testimony. We note that Mother has signed releases allowing information from Lighthouse to be sent to the Agency. (Hrg. Tr., p. 104.) Cook's testimony about the report included information as to Mother's failure to attend certain scheduled appointments and her sporadic attendance in general. Mother has suffered no prejudice from this testimony, as she admitted at hearing that her attendance at the facility was sporadic and inconsistent.

**{¶60}** Mother raises the same argument regarding Cook's testimony about correspondence she received from Lighthouse employee, Lucas Bennett. Cook's testimony regarding Bennett was also directed at Mother's sporadic attendance at appointments. Again, Mother signed a release specifically pertaining to this information and provided her own testimony conceding that she missed many appointments and delayed the start of her treatment.

**{¶61}** Mother argues the court erred in allowing the two foster families to provide statements, since they were unsworn witnesses who were not subject to cross-examination. We acknowledge that "although R.C. 2151.424(A) grants a foster parent the right to testify as a sworn witness at the permanent custody hearing, '[w]e are not

aware that the law affirmatively provides for foster parents to make unsworn statements in permanent custody proceedings.' " *In re S.F.*, 9th Dist. Summit No. 27908, 2016-Ohio-5213, ¶ 18

**{¶62}** That said, in Ohio, it "is well-established that a party may not, upon appeal, raise a claim that the oath of a witness was omitted or defective, unless objection thereto was raised at trial. If no objection was raised, the error is considered to be waived. This is because the failure to administer an oath can easily be corrected at the time; an attorney may not fail to object and then cite the lack of an oath as error." *In re R.S.*, 8th Dist. Cuyahoga No. 110210, 2021-Ohio-2271, ¶ 48, quoting *Stores Realty Co. v. Cleveland*, 41 Ohio St.2d 41, 322 N.E.2d 629 (1975); *State v. Norman*, 137 Ohio App.3d 184, 198, 738 N.E.2d 403 (8th Dist.1999); *State v. Davis*, 8th Dist. Cuyahoga No. 105299, 2017-Ohio-8873. To establish plain error in these cases, Mother must show that the unsworn testimony affected the outcome of the proceedings or that she was otherwise prejudiced by the testimony. *Id.* at 49. There is no prejudice where the court does not rely on the statement, or the statement does not add to or change the evidence before the court. *Id.* See also *In re S.F., supra.*

**{¶63}** Contrary to Mother's assertion, there is no evidence that the court relied on the statements made by the foster families. While it is true that some of the court's findings are similar to the foster families' statements, their testimony also mirrored the statements made by Cook and Kimberly Thrower in their testimony. Each of these witnesses testified to similar observations regarding the children's relationship with their foster families. Thus, the record does not show the trial court relied on any statement made by the foster families.

{¶64} Mother also argues that testimony from Cook about an email she received from "Journey Home" constituted hearsay. This email discussed how the children were doing with their foster families. In reviewing this argument, we realize the Agency must routinely rely on outside sources in managing its casework. The Agency must obtain releases for much of its information and is subject to all rules of evidence at trial. That said, Kimberly Thrower testified the Agency "receives monthly reports surrounding the care of the children" regarding their foster families. (Hrg. Tr., p. 63.) Thrower did not go into detail about the contents of the emails, but did state her opinion that the children's needs were being met by their foster families. This is consistent with the GAL reports. As to A.D., Cook testified that she had personally observed the child while in the care of her foster family. While she did not personally view the remaining children in their foster home, Cook was receiving information from Journey Home and the GAL reports to update her on the progress of these children. In addition, she did personally observe the children at visitation on a number of occasions and could witness their interactions with their foster families and the difference in the children's speaking ability and cleanliness.

{¶65} This record contains no evidence of deficient performance on the part of counsel, nor is there any resulting prejudice concerning trial counsel's performance. Mother's third assignment of error is without merit and is overruled.

<u>FATHER'S ASSIGNMENT OF ERROR NO. 2</u>

THE TRIAL COURT VIOLATED THE APPELLANT'S RIGHT TO DUE PROCESS AT THE PERMANENT CUSTODY HEARING.

{¶66} As previously discussed, Father appeared at the hearing by telephone from the Carroll County jail. The record reveals the court attempted to communicate with

Father immediately after Mother's testimony, and at that point discovered Father was no longer on the line. The Agency contacted the jail and reinitiated contact with Father. The court inquired from Father how long the call had been disconnected, and Father responded that it had been at least an hour. The court asked why the jail personnel did not take any efforts to inform the court that Father was no longer on the line. Father responded "[t]hey [the jail] didn't know how to – what to do about it, like they didn't know if you guys were going to try to call back or if they should try to call back or what court to call." (Hrg. Tr., pp. 162-163.) The court indicated that it would determine "something in terms of the testimony that [Father] missed," but nowhere in the record does it appear that the matter was again addressed.

**{¶67}** We have recently acknowledged a parent's right to be present at a termination of parental rights hearing. *In re S.G.*, 7th Dist. Belmont No. 22 BE 0030, 2022-Ohio-4292, ¶ 47. The First, Eighth, Ninth, and Tenth Districts have classified this as a constitutional right. See *In re N.J.*, 8th Dist. Cuyahoga No. 110302, 2021-Ohio-2525, ¶ 24; *In re S.G.*, 1st Dist. Hamilton No. C-200261, 2020-Ohio-5244, ¶ 20; *In re J.W.*, 9th Dist. Summit No. 24924, 2009-Ohio-6957, ¶ 20; *In re Sears*, 10th Dist. Franklin No. 01AP-715, 2002 WL 124718, *4 (Jan. 31, 2002). These courts have held that "[b]iological parents have a constitutionally protected right to be present at a permanent custody hearing." *In re N.J.* at ¶ 24.

**{¶68}** Regarding an incarcerated parent, the Tenth District has explained that "[a]lthough those same constitutionally protected rights extend to an incarcerated parent, those rights may not be absolute." *In re Sears* at *6. Where a biological parent is incarcerated, a court reviews any infringement on the right to attend the hearing by

balancing the due process factors enumerated within *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Those rights include: "(1) the private interest affected, (2) the risk of erroneous deprivation of that interest through the procedures used and the probable value, if any, of other procedural safeguards, and (3) the state's interest, including the function involved and the fiscal and administrative burdens of additional procedural safeguards." *In re S.G.* at ¶ 19, citing *Mathews v. Eldridge, supra.*

{¶69} The trial court in this matter initially granted Father the right to be present at the hearing. However, problems ensued in the manner in which the court attempted to achieve this goal. First, Mother and her counsel and the Agency and its counsel physically appeared at the hearing while Father appeared by phone, and Father's counsel appeared by Zoom. This use of mixed technology became clearly problematic both at hearing and in producing the necessary transcripts in this case.

{¶70} While we recognize that there may be times where it is appropriate to utilize technology in ensuring an appearance, the different types of technology used to obtain appearances by parties and their counsel presents unique problems. If a necessary party to the action cannot appear in person and requires some sort of accommodation, ideally all parties should appear in that same fashion. While we appreciate that technology has made courts more accessible and has increased access to justice, it can also affect the process in a negative way.

{¶71} That said, it is clear Father had a constitutional right to be present at the hearing and to hear all testimony against him. While we recognize that Ohio courts have held that an incarcerated individual may not have an absolute right to this protection, this

record reflects that the trial court granted Father the right to be present. Thus, the court was responsible for ensuring Father's rights were accommodated.

{¶72} Especially problematic here, is that no one asked Father what testimony he had last heard or whether he heard any portion of Mother's testimony. Father alleges he was disconnected for over an hour. While we know that Mother's testimony immediately preceded the court's attempt to reconnect Father, we have no way of knowing how long each witness testified. Thus, it is possible that Father may have also missed part of Nicole Cook's testimony. While the Agency appears to place the burden on Father to show at what point he was disconnected, it does not appear that Father had any way to accomplish this due to his incarceration.

{¶73} The Agency also seems to place the burden on Father to reestablish the lost connection. It appears from Father's explanation that the jail staff had control over the telephone system. Father stated that the staff was confused when he was disconnected and Father, an incarcerated person, did not have the control or ability to place the call to reconnect with the hearing himself. Again, there was no inquiry into exactly what portion of the hearing Father missed.

{¶74} Based on this record, the trial court failed to completely ensure Father's right to be present, failing to inquire as to what testimony Father missed. The court also failed to provide a meaningful remedy, such as ordering the relevant witness to be re-questioned. It is also clear that trial counsel erred in failing to object or personally inquire of Father what testimony he heard so that it could be determined what portion of the hearing he missed. However, even though the record reflects error, in order to be reversible this error must also have caused harm. This record shows that the error did

Case Nos. 22 JE 0016; 22 JE 0017

not prejudice Father. It is clear from Father's subsequent testimony that he knew the accusations against him and that the primary concerns against him involved domestic violence, his failure to seek couples' counseling and anger management counseling, the issues surrounding his mother's disqualification to take custody of the children, and his poor behavior at visitation.

**{¶75}** It is apparent from Father's testimony that he was aware of the Agency's evidence against him and of Mother's allegations. In his testimony he addressed both domestic violence arrests, the allegation that he removed the generator from the family home during the winter leaving Mother and the children in the cold, the allegation that he screwed the windows shut to prevent Mother's access to the house, and his failure to attend couples' and anger management counseling. In addition, Father's counsel, the Agency, Mother's counsel, and counsel for CASA were able to question Father and he was able to address any additional concerns raised. Thus, although the trial court's failure to remedy Father's temporary involuntary absence from the hearing, the record reveals Father was not prejudiced by this error.

**{¶76}** We must also *sua sponte* note that the Agency raised a potential conflict of interest pertaining to counsel for CASA. CASA is described as a neutral third party who represents the GAL. At the commencement of the hearing, the Agency raised the fact that CASA's counsel had represented Father in a 2020 criminal matter involving cruelty to animals. Apparently, counsel for the Agency sent counsel for CASA an email the day before the hearing expressing concern about this representation. Counsel for CASA sent Mother's counsel a text message that night regarding the issue, but Father's current counsel was unaware of the issue until it was raised at the hearing.

**{¶77}** At the hearing, the Agency expressed concern because it would not be able to use Father's conviction against him if counsel for CASA were allowed to remain involved in the case. The Agency explained that it intended to use the conviction, but feared that this evidence would open the door to an appeal if counsel for CASA remained involved. Accepting the Agency's statement as a solution instead of a request for relief, the court permitted counsel for CASA to remain on the case. In addition to the court's interpretation of the Agency's "offer" to withhold the conviction from evidence, the court accepted counsel for CASA's statement that the conviction had not been discussed with the GAL before the reports and recommendation were completed.

**{¶78}** While this exchange is troubling, it appears that the only party to suffer any prejudicial harm may have been the Agency, which was unable to use the 2020 conviction against Father as it had originally planned. Despite the unusual procedural issues in this record, Father's second assignment of error is without merit and is overruled.

<u>Conclusion</u>

**{¶79}** Mother and Father both contest the trial court's decision that the children's interests were best served by placing them in the permanent custody of the Agency. Both Mother and Father also raised due process concerns. Additionally, Mother argued that her counsel was ineffective. For the reasons provided, all of Mother's and Father's arguments are without merit and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Robb, J., concurs.

<u>Case Nos. 22 JE 0016; 22 JE 0017</u>

_____

For the reasons stated in the Opinion rendered herein, the assignments of error are overruled and it is the final judgment and order of this Court that the judgment of the Court of Common Pleas, Juvenile Division, of Jefferson County, Ohio, is affirmed. Costs waived.

A certified copy of this opinion and judgment entry shall constitute the mandate in this case pursuant to Rule 27 of the Rules of Appellate Procedure. It is ordered that a certified copy be sent by the clerk to the trial court to carry this judgment into execution.

### NOTICE TO COUNSEL

**This document constitutes a final judgment entry.**